STATE OF NORTH CAROLINA v. JAMES WALLACE JACKSON

No. 351A84

(Filed 3 June 1986)

**1. Criminal Law § 178— admissibility of confession—law of the case**

The Supreme Court's decision in a prior appeal that defendant's confession was admissible was conclusive on this issue under the doctrine of the "law of the case" where the evidence relating to the admissibility of the confession was virtually identical to the evidence before the Supreme Court on the prior appeal.

**2. Jury § 7.13— death penalty not sought by State—number of peremptory challenges**

A defendant tried for first degree murder was entitled to only six rather than fourteen peremptory challenges where the case lost its capital nature when the prosecution announced prior to the commencement of jury selection that it would not seek the death penalty due to a lack of any aggravating circumstances.

**3. Constitutional Law § 60; Jury § 7.14— peremptory challenges of blacks—non-retroactivity of U. S. Supreme Court decision**

The decision of *Batson v. Kentucky*, 476 U.S. ---, 90 L.Ed. 2d 69, holding that a defendant can establish a *prima facie* case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at his trial, will not be applied retroactively even as to cases not finally determined on direct appeal as of the date of the filing of that opinion. Rather, the ruling in *Batson* will be applicable only to those cases in which the jury selection took place after that decision was rendered.

**4. Constitutional Law § 60; Jury § 7.14— peremptory challenges of blacks—no denial of fair cross-section of community**

The prosecution's use of peremptory challenges to exclude blacks from the jury did not violate defendant's right to a jury drawn from a fair cross-section of the community since the Sixth Amendment fair cross-section requirement

1

applies only to the pool from which petit jurors are selected and imposes no requirement that the petit jurors actually chosen must mirror the community and reflect the various distinctive groups in the population.

5. **Homicide § 21.5— first degree murder—premeditation and deliberation—sufficiency of evidence**

There was sufficient evidence of premeditation and deliberation to support defendant's conviction of first degree murder where the evidence tended to show that defendant thrust a knife into the victim's back with such force that it went completely through her body; the victim did not in any way provoke defendant into attacking her; following the killing, defendant callously remarked to another person that "somebody [had] messed her up bad"; and defendant admitted that he attempted to cover up his involvement in the crime by placing a steel file in an empty space in a knife rack and by disposing of the knife used as the murder weapon. Furthermore, the jury could have inferred from the evidence that the fatal stab was not inflicted until the time of the victim's second scream some thirty to forty-five seconds after her initial scream, and such inference would support a finding that the killing was premeditated and deliberate.

Justice EXUM dissenting in part.

Justice FRYE joins in this dissenting opinion.

Justice BILLINGS did not participate in the consideration or decision of this case.

BEFORE *Ellis, J.,* at the 20 February 1984 Criminal Session of Superior Court, WAKE County, defendant was convicted of first-degree murder. Prior to trial, the prosecution had announced that the evidence did not support the existence of any of the aggravating factors listed in N.C.G.S. § 15A-2000(e) upon which the jury could recommend the imposition of the death penalty. Therefore, upon defendant's conviction, the trial court entered judgment sentencing him to a term of life imprisonment. The defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 13 March 1985.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Gerald L. Bass for the defendant-appellant.*

MEYER, Justice.

The State presented evidence which tended to show that on 15 March 1981, Leslie Hall Kennedy, a student at North Carolina State University, was living in a house located at 207 Cox Ave-

nue in Raleigh. The house was divided into three separate apartments, and Mrs. Kennedy occupied the one which was across the front of the house. Mrs. Kennedy's husband was working in Florida at the time, and she was living alone. Mr. Kennedy testified that the lock on the front door often failed to catch and that Mrs. Kennedy usually neglected to close the door's bolt lock.

One of the other two apartments was occupied by two North Carolina State students, Ron Riggan and Ivan Dickey. Riggan returned to the apartment from spring vacation at approximately 7:00 p.m. on 15 March 1981. His girlfriend, Jamie Morehead, subsequently came over for a visit. At some point between 8:00 and 8:30 p.m., Riggan saw Mrs. Kennedy's car drive up to the house. Although he did not see Mrs. Kennedy, Riggan heard only one car door being shut. He did not hear any conversation or other sound which would indicate that anyone was with Mrs. Kennedy. At approximately 9:00 p.m., Ivan Dickey returned to the apartment. Riggan, Dickey, and Morehead proceeded to watch television and talk.

At approximately 9:00 p.m., Mrs. Kennedy made a phone call to her husband. They spoke for approximately twenty-five minutes. Near the end of the conversation, Mrs. Kennedy told her husband that she was going to sit in bed and read for a little while.

At approximately 10:35 p.m., Riggan, Dickey, and Morehead heard two loud, piercing screams coming from Mrs. Kennedy's apartment. Riggan went to a common wall adjoining the two apartments and called out to Mrs. Kennedy. After failing to hear a response, all three went around to the front of the house. They observed that the front door was open and that there was blood on the front porch around the door. Riggan decided to go back to his apartment to arm himself. At that point, they heard a loud laugh emanating from the vicinity of Pullen Park. Dickey decided to walk up the street to investigate the laugh. Riggan, accompanied by Morehead, went back to his apartment and got a weight lifting bar to use as a club. Dickey soon returned, and they walked back around to the front of the house.

As they neared the front of the house, a man, subsequently identified as the defendant, walked up and stated that a girl had told him that she had heard someone in the area scream. Riggan

confirmed this, and he, Dickey, and the defendant went up on the porch and looked through the bedroom window. They could not see whether anyone was on the bed. However, they did notice a steel hand file on a chair in front of the window. The three then proceeded into the apartment. Riggan soon discovered Mrs. Kennedy lying on a bed with blood beneath her arm. She appeared to be dead.

At that point, Riggan and Dickey left the apartment and, along with Morehead, started back to their apartment to call the police. Riggan, however, noticed that the defendant was not with them, and he asked Dickey to go back and watch the defendant. Riggan proceeded to call the police. Dickey went back to Kennedy's apartment and called out for the defendant. Approximately one minute later, the defendant came out the door and remarked that "somebody messed her up bad." Dickey and the defendant then went back to the apartment shared by Dickey and Riggan. Shortly thereafter, the police arrived. All four were instructed to "stay around" the apartment so that their statements could be obtained. The police then entered the house. Within a few moments, Morehead observed the defendant walking away from the apartment.

Mrs. Kennedy was dead at the time the officers entered the house. Dr. Dana Copeland, a pathologist, testified that he performed an autopsy on the deceased on 16 March 1981. The autopsy revealed a stab wound extending from a point in the middle of the back eleven inches from the top of the head completely through the body to a point slightly above the left breast. He stated that, in his opinion, the wound could have been caused by a ten-inch butcher knife. Dr. Copeland also testified that, in his opinion, the deceased died as a result of the loss of blood through the wound into the left side of the chest.

The day after the killing, Mr. Kennedy returned to Raleigh and walked through the apartment with a detective of the Raleigh Police Department. While in the apartment, Kennedy noticed that a ten-inch butcher knife was missing from the knife rack which was located in the kitchen. On 31 March 1981, the police discovered a butcher knife of the same brand as the one missing from the Kennedy apartment near a railroad track a short distance from the apartment on Cox Avenue.

On three separate occasions, 26 March 1981, 27 March 1981, and 8 April 1981, the police questioned the defendant about the killing. The factual circumstances surrounding those interviews are set out in detail in this Court's opinion in *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983). We deem it unnecessary to repeat those facts here. On the evening of 8 April 1981, the defendant made a statement in which he said that he had met Mrs. Kennedy on 13 March 1981 and that she had invited him to come over to her apartment on 15 March. After he arrived at the apartment, they went into the bedroom and Mrs. Kennedy got in bed. At first, the defendant sat on the bed and talked with her. However, the defendant stated that he believed Mrs. Kennedy wanted to engage in sexual activity, and he soon began to touch and feel her. After a few minutes of such activity, Mrs. Kennedy began screaming. The defendant stated that he became very frightened. He said he panicked, picked up a knife that was on a table beside the bed, and stabbed her in the back. He then ran out of the house and down the street toward Pullen Park.

The defendant further stated that he was afraid that he had killed the woman and decided to go back to the apartment to see if she was still alive. He placed the knife beside a tree and walked back to the apartment. When he returned, there were other people standing in the yard. He told them that a girl had said that she heard someone scream. He and two other men then entered the house. After one of the men saw the body, they left to call the police. The defendant stated that he went back inside the house, picked up the steel file that was on a chair in the bedroom, and placed it in the knife rack in the kitchen. He said that after the police arrived and went inside the house to investigate, he left the scene and walked back down the street. He stated that he retrieved the knife and threw it away near some railroad tracks and then went home.

The defendant presented no evidence.

Based on this and other evidence, the jury found the defendant guilty of first-degree murder. The court entered judgment sentencing the defendant to a term of life imprisonment.

[1]  The defendant initially contends that the trial court erred by allowing the prosecution to introduce his 8 April 1981 statement into evidence. He argues that the factual circumstances surround-

ing the various interview sessions show that he was in custody at the time the statement was made, and since the officers did not have probable cause to take him into custody, the confession is inadmissible under *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824 (1979). He also contends that the facts surrounding the interview sessions show that the confession was involuntary.

On 18 February 1982, a superior court judge granted the defendant's motion to suppress the confession. The State appealed from this order. We reversed the trial court and held the statement to be admissible in *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134. In that case, we carefully examined the factual circumstances surrounding the three interview sessions and determined that the defendant was not in custody prior to the time he gave the statement and therefore the confession's exclusion was not required by *Dunaway*. We also concluded that the statement was voluntarily made by the defendant.

The defendant acknowledges that these issues have already been decided adversely to him. He contends, however, that there is additional evidence which was not previously before this Court which mandates the reversal of our prior decision. We do not agree. The defendant has failed to point to any evidence produced at trial which was not previously before this Court that tends to strengthen his argument that he was in custody at the time the statement was made. The defendant has likewise failed to point to any new evidence which strengthens his assertion that the statement was not voluntarily made. Since the evidence relating to the admissibility of the inculpatory statement made by the defendant is virtually identical to the evidence which was previously before us, the doctrine of "the law of the case" applies to make our prior ruling on this issue conclusive. *State v. Wright*, 275 N.C. 242, 166 S.E. 2d 681, *cert. denied*, 396 U.S. 934, 24 L.Ed. 2d 232 (1969). *See also State v. Hill*, 281 N.C. 312, 188 S.E. 2d 288 (1972); *State v. Stone*, 226 N.C. 97, 36 S.E. 2d 704 (1946); *State v. Lee*, 213 N.C. 319, 195 S.E. 785 (1938). This assignment of error is overruled.

[2] The defendant next argues that the trial court erred by limiting him to only six peremptory challenges. He argues that since he was being tried for first-degree murder, he was entitled to fourteen challenges. We do not agree.

N.C.G.S. § 15A-1217(a) provides that in a "capital case," a defendant is allowed fourteen peremptory challenges. N.C.G.S. § 15A-1217(b) states that in a "noncapital case," a defendant is entitled to six challenges. A "capital case" has been defined as one in which the death penalty may, but need not necessarily, be imposed. *State v. Barbour*, 295 N.C. 66, 243 S.E. 2d 380 (1978). *See also* N.C.G.S. § 15A-2000(a)(1), which defines "capital felony" as "one which may be punishable by death." A case loses its "capital" nature if it is determined that while the death penalty is a possible punishment for *the crime charged*, it may not be imposed in *that particular case. E.g., State v. Braswell*, 312 N.C. 553, 324 S.E. 2d 241 (1985) (prosecution announced that it would not seek the death penalty due to a lack of any aggravating circumstances); *State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984) (judge determined that there were no aggravating factors applicable upon which the jury could base a recommendation that the defendant be sentenced to death); *State v. Leonard*, 296 N.C. 58, 248 S.E. 2d 853 (1978) (prosecution announced at the beginning of the trial that the State would not seek the death penalty); *State v. Barbour*, 295 N.C. 66, 243 S.E. 2d 380 (death penalty could not be imposed because the murder occurred during the interval between the invalidation of North Carolina's mandatory death penalty law by the United States Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944 (1976), and the effective date of the act reinstating the death penalty).

In this case, the prosecution announced prior to the commencement of jury selection that there was no evidence which would support a reasonable inference of any aggravating factor upon which the jury could recommend a sentence of death should the defendant be convicted of first-degree murder. The case therefore lost its capital nature. We have previously held that when a capital case loses its capital nature, the defendant is not entitled to fourteen peremptory challenges. *State v. Leonard*, 296 N.C. 58, 248 S.E. 2d 853; *State v. Barbour*, 295 N.C. 66, 243 S.E. 2d 380. The defendant, however, argues that *Leonard* and *Barbour* are not controlling because the murders in those cases were committed during a period when North Carolina did not have a valid death penalty statute. Therefore, he argues, the death penalty would not have been applicable to those defendants. That fact, however, is completely irrelevant to the holdings in those

cases to the effect that, when a case loses its capital nature, a defendant is no longer entitled to fourteen peremptory challenges. Since the State announced in open court that it would not seek the death penalty against the defendant, the case lost its capital nature and the defendant was entitled to only six peremptory challenges. This assignment of error is overruled.

[3]  Next, the defendant argues that the trial court erred by denying his motion for a mistrial upon the basis that the prosecution used its peremptory challenges to improperly exclude blacks from the jury.

Initially, we note that although the transcript of the jury voir dire was not made a part of the record before this Court, the following transpired just before the jury was empaneled:

MR. BASS: Your Honor, I would like to address the court if I could very briefly on a matter that I would like to put into the record.

COURT: All right. Now, I will hear you, Mr. Bass.

MR. BASS: Your Honor, we would like to put a motion in the record at this time for a mistrial because of the automatic exclusion by the State of all black jurors which came up here with the exception of one. We would like to review for the record what transpired. The State used five challenges. The first one was Sandra Jackson. They exercised a peremptory instruction [sic] there. She was juror number ten on the front row in the first group. Let the record show that she was black. The next in the second group was number nine on the front row, Kenneth Stewart, who identified himself as a UNC law student at Chapel Hill. He was black. He was likewise dismissed, excused in [sic] the peremptory instruction [sic]. And the next group that come on [sic], we had juror number three on the back, Shannon Keck. I would like the record to show that likewise she was black. She was a student at Enloe High School. The Court in its discretion excused that juror and upon motion of the State.

The next juror the Court excused for cause was Michael Vann, juror number eight, sitting on the front row who identified himself as an IBM employee. He was black. He identified himself as a Jehovah's Witness and he was excused for

cause without inquiring as to how his views as a member of that church may conflict with the law. Let the record show that he was likewise black.

The next group that came on was juror number twelve, Iris Riddick, who was peremptorily challenged by the State without any reason given for it other than they excused her. Like the record to show that she was black.

The next one was Margaret Hunter, juror number eight, on the front row, peremptory challenge was used. Like the record to reflect that Mrs. Hunter was black. The only other peremptory challenge used by the State in their five was a student out at NC State University. And, Your Honor, we believe that the systematic exclusion of blacks on the jury, the defendant being black—we are left with one black juror up there—is a denial of this man's right to a fair trial under the Constitution and ask the Court to declare a mistrial in the case.

MR. STEPHENS: Your Honor, I would note for the record that the defendant systematically excluded whites from the jury. So he took no blacks at all and took all of his peremptory challenges [to] white[s] as members of the jury.

The record should also reflect certainly the State did not intentionally eliminate systematically blacks from this jury for that, for any purpose and did not systematically eliminate black jurors. There is one black juror sitting on the jury now. The State also challenged peremptorily one white juror. There were sufficient reasons to counsel for the State concerning the background, family situation of each of the jurors that we challenged to satisfy us that that was not the type of juror we were looking for. For that reason and no other reason. Not based on any rational [sic] background or makeup. We peremptorily challenged the jurors that we did. Therefore, I do not think the record will bear out the State having systematically excluded blacks. Also, eliminated whites, a white person as well and left sitting on the jury one black person. That they, that blacks were systematically excluded, certianly [sic] did not intend to.

MS. BYERS: Your Honor, we would like for the record to show that the final jury of twelve, as selected, includes one black.

COURT: All right. Anything else, gentlemen?

MR. STEPHENS: No, sir.

COURT: I will deny the motion of the defendant. Sheriff, we will take a recess until 2:30.

[Def.'s Exception No. 2]

[RECESSED FOR LUNCH.]

P. M. SESSION. COURT: Madam Clerk, if you would, empanel the jury.

[JURY DULY EMPANELED.]

The record thus indicates that the jury finally empaneled consisted of eleven whites and one black and that the State peremptorily excused four prospective black jurors. The record further indicates that the jury which convicted the defendant included one black juror. Also, the prosecution peremptorily excused one prospective white juror. In response to the defendant's motion, the prosecution stated that the prospective black jurors were not challenged on the basis of their race, but were excluded because it was felt that their backgrounds and family situations made them "not the type of juror we were looking for." The prosecutor did not elaborate further. The trial court denied the defendant's motion for a mistrial.

The historic starting point for a discussion of this issue had been *Swain v. Alabama*, 380 U.S. 202, 13 L.Ed. 2d 759, *reh'g denied*, 381 U.S. 921, 14 L.Ed. 2d 442 (1965). In *Swain*, the United States Supreme Court held that, in light of the purposes and functions of peremptory challenges, the Constitution did not mandate an examination of the prosecutor's reasons for exercising the challenges in any particular case. Instead, the presumption in any given case was that the prosecution utilized its peremptory challenges to obtain a fair and impartial jury. The Supreme Court went on to say that in order for a defendant to prevail on a claim that the prosecutor had unconstitutionally excluded blacks from his jury, he was required to establish that the prosecutor had

engaged in case after case in a pattern of systematic use of peremptory challenges to exclude blacks from the petit jury. This Court consistently followed the *Swain* standard. *E.g.*, *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980); *State v. Shaw*, 284 N.C. 366, 200 S.E. 2d 585 (1973). The defendant did not meet the *Swain* standard.

However, in the recent case of *Batson v. Kentucky*, 476 U.S. ---, 90 L.Ed. 2d 69 (1986), the United States Supreme Court overruled the evidentiary standard established in *Swain*. In *Batson*, the petitioner, a black man, was tried on charges of burglary and receipt of stolen goods. During the jury voir dire, the prosecutor used peremptory challenges to strike all four blacks on the venire, and a jury composed only of whites was selected. The defendant made a motion to discharge the jury before it was sworn on the basis that the prosecutor's removal of the black veniremen violated his rights under the sixth and fourteenth amendments to a jury drawn from a cross-section of the community, and under the fourteenth amendment to equal protection of the laws. The trial judge denied the motion. The petitioner was subsequently convicted and the Supreme Court of Kentucky affirmed the conviction. *Id.* at ---, 90 L.Ed. 2d at 78-79.

In *Batson*, the Supreme Court reaffirmed the principle, recognized in *Swain*, that the equal protection clause is violated by the purposeful or deliberate exclusion of blacks from jury participation. However, the Court went on to reject the *Swain* requirement that a defendant show a history of systematic use of peremptory challenges to exclude blacks in order to prevail on an equal protection challenge. The Court held that a defendant could establish a *prima facie* case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at his trial. *Id.* at ---, 90 L.Ed. 2d at 87. The Court stated that in order to establish such a *prima facie* case, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; second, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that lends itself to potential abuse; and third, the defendant must show that these facts and any other relevant

circumstances (e.g., a pattern of strikes against black jurors in a particular voir dire, questions and statements by the prosecutor during voir dire, etc.) raise an inference that the prosecutor used peremptory challenges to exclude prospective jurors on the basis of race. *Id.* Once the defendant has made a *prima facie* showing, the State has the burden to come forward with a neutral explanation for challenging the black jurors. The explanation need not rise to the level justifying excusal for cause. However, the prosecutor's mere denial that he had a discriminatory motive is insufficient to rebut a *prima facie* showing of purposeful discrimination. *Id.* Because the trial court had not required the prosecutor to explain his reasons for exercising the peremptory challenges, the Supreme Court remanded the case to the trial court for a determination of whether the facts established a *prima facie* showing of purposeful discrimination and, if so, whether the prosecution could articulate a racially neutral explanation for the action. *Id.* at ---, 90 L.Ed. 2d at 90.

In his opinion for the Court, Justice Powell did not, however, decide the question of whether *Batson* would apply retroactively. Justices White and O'Connor, in concurring opinions, and Chief Justice Burger, in a dissenting opinion joined by Justice Rehnquist, expressed the view that the decision should not apply retroactively. After careful consideration, we believe that previous decisions by the Supreme Court lead to the conclusion that *Batson* is not to be accorded retroactive effect, even as to cases, such as this, which were not finally determined on direct appeal as of the date of the filing of the opinion in *Batson.*

Any analysis of this issue must begin with *Linkletter v. Walker*, 381 U.S. 618, 14 L.Ed. 2d 601 (1965). In that case, the Supreme Court was faced with the question of whether the ruling in *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081 (1961) (requiring the exclusion in state trials of evidence seized in violation of the fourth amendment) applied retroactively to the state court convictions which had become final prior to the rendering of the decision.[1] After a review of previous decisions, the Court concluded

---

1. The Court defined "final" as meaning that the judgment of conviction had been rendered, the availability of appeal exhausted, and the time for filing a petition for certiorari had elapsed.

that the retroactive application of any particular case was neither required nor prohibited by the Constitution. Instead, it was necessary to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation" to determine whether retroactive application was called for. *Linkletter v. Walker*, 381 U.S. at 629, 14 L.Ed. 2d at 608. The Court held that retroactive application of *Mapp* in *habeas corpus* cases was not mandated. In reaching this conclusion, the Court stated that since police misconduct had already occurred, the goal of *Mapp* to deter such misconduct would not be furthered by retroactive application of the ruling. The Court also noted that retroactive application of *Mapp* would place a severe strain on the administration of justice, i.e., the nation's judicial machinery.

In *Johnson v. New Jersey*, 384 U.S. 719, 16 L.Ed. 2d 882, *reh'g denied*, 385 U.S. 890, 17 L.Ed. 2d 121 (1966), the Supreme Court denied retroactive application to *Escobedo v. Illinois*, 378 U.S. 478, 12 L.Ed. 2d 977 (1964), and *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966). The Court emphasized that the argument in favor of retroactive application was stronger where the new ruling "affected 'the very integrity of the fact-finding process' and averted 'the clear danger of convicting the innocent.'" *Johnson v. New Jersey*, 384 U.S. at 727-28, 16 L.Ed. 2d at 889 (quoting *Linkletter v. Walker*, 381 U.S. at 639, 14 L.Ed. 2d at 614, and *Tehan v. Shott*, 382 U.S. 406, 416, 15 L.Ed. 2d 453, 460 (1966)). The Court ruled that because of the fact that law enforcement agencies had relied on cases prior to *Escobedo* and *Miranda* and in light of the disruption to the administration of justice that retroactive application would cause, the decisions would not apply retroactively. The Court also found that there was no valid justification for distinguishing, for purposes of retroactive application of these cases, convictions which had become final and those still pending on direct appeal at the time the decisions were announced. Consequently, *Escobedo*, and *Miranda* were held to be applicable only to trials begun after the date the decisions were rendered.

In *Stovall v. Denno*, 388 U.S. 293, 18 L.Ed. 2d 1199 (1967), the Supreme Court expressly stated for the first time that, in determining whether to give a ruling retroactive effect, three factors were to be considered and weighed: (1) the purpose to be served

by the new rule, (2) the extent of the reliance by law enforcement officials on the prior rule, and (3) the effect that a retroactive application of the rule would have on the administration of justice. Again, the Court noted that the extent to which a new rule enhanced the reliability and integrity of the fact-finding process at trial was an important consideration under the first factor. Furthermore, the Court again said that with regard to the retroactive application of the ruling in question—the right to counsel at post-indictment lineups established in *United States v. Wade*, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)—it could perceive of no justification for distinguishing between convictions which had become final and those which were at various stages of trial and direct review when the ruling was announced. After applying the three-prong test, the Court concluded that the ruling was not to be given retroactive effect.

In *Desist v. United States*, 394 U.S. 244, 22 L.Ed. 2d 248 (1969), the Court was required to consider whether *Katz v. United States*, 389 U.S. 347, 19 L.Ed. 2d 576 (1967) (which held that the fourth amendment encompassed nontrespassory electronic surveillance), should be applicable retroactively. At the outset, the Court seemed to accept the proposition that the decision to not apply a ruling retroactively can only be justified where the ruling is a "clear break with the past" as opposed to being a "foreshadowed" decision. *Desist v. United States*, 394 U.S. at 247-48, 22 L.Ed. 2d at 254. The Court went on to say that the most important of the three *Stovall* criteria was the purpose to be served by the rule. In discussing the second *Stovall* factor—the extent of reliance of law enforcement officials on the prior rule—the Court stated that its periodic restatements of prior case law rejecting application of the fourth amendment to such situations fully justified reliance by the police and courts of their continuing validity. The Court ultimately held that *Katz* was not to be applied retroactively.

Over the next decade, the Supreme Court applied the *Stovall* test in a number of cases involving the question of retroactive application of a new constitutional criminal procedure ruling. *See* 1 W. LaFave and J. Israel, *Criminal Procedure* § 2.9 (1984). Some of the decisions held that prior rulings were to be accorded retroactive effect. *E.g., Brown v. Louisiana*, 447 U.S. 323, 65 L.Ed. 2d 159 (1980) (made retroactive the decision in *Burch v. Louisiana*, 441

U.S. 130, 60 L.Ed. 2d 96 (1979), which held that conviction of a non-petty criminal offense by a non-unanimous six-person jury violates the defendant's sixth and fourteenth amendment right to trial by jury). Other decisions held that previous rulings were not retroactive. *E.g., Gosa v. Mayden,* 413 U.S. 665, 37 L.Ed. 2d 873 (1973) (held nonretroactive the ruling in *O'Callahan v. Parker,* 395 U.S. 258, 23 L.Ed. 2d 291 (1969), which held that military personnel are entitled to a civilian trial for charged offenses that are not service related); *Adams v. Illinois,* 405 U.S. 278, 31 L.Ed. 2d 202 (1972) (held nonretroactive the ruling in *Coleman v. Alabama,* 399 U.S. 1, 26 L.Ed. 2d 387 (1970), that an accused is entitled to assistance of counsel at a preliminary hearing).

The case of *United States v. Johnson,* 457 U.S. 537, 73 L.Ed. 2d 202 (1982), marked a new chapter in this area. *Johnson* involved the question of whether the ruling in *Payton v. New York,* 445 U.S. 573, 63 L.Ed. 2d 639 (1980) (holding that the fourth amendment prohibits the police from making a warrantless, non-consensual entry into a suspect's home to make a routine felony arrest), was to be applied retroactively to a case which was on direct appeal at the time *Payton* was decided. After reviewing the history of *Linkletter* and its progeny, noting the apparent inconsistent results engendered by application of the *Stovall* criteria and calling attention to the fact that several members of the Court had indicated that all defendants whose cases were on direct appeal at the time of a law-changing decision should be entitled to invoke the new rule, the Court announced that " '[r]etroactivity must be rethought.' " *United States v. Johnson,* 457 U.S. at 548, 73 L.Ed. 2d at 213 (quoting *Desist v. United States,* 394 U.S. at 258, 22 L.Ed. 2d at 260 (Harlan, J., dissenting)).

The Court stated that an analysis of post-*Linkletter* cases established that in three narrow categories of cases, the answer to the retroactivity question was not determined by application of the *Stovall* criteria, but was instead decided through the application of a "threshold test." First, when a decision merely applied settled precedents to new and different factual situations, the rule will be retroactive. Second, when the Court had expressly declared a new ruling to be a "clear break with the past," it would not be retroactive. The Court said that a "clear break" occurred in three circumstances: (1) when a decision explicitly overrules a past precedent of the Court, (2) when a decision disap-

proves a practice that the Court had arguably sanctioned in previous cases, and (3) when a decision overturns a longstanding and widespread practice to which the Court had not spoken, but which a near-unanimous body of lower court authority had expressly approved. Third, full retroactivity was considered inherent in a ruling that a trial court lacked the basic authority to convict or punish a defendant for the charged offense.

The Court found that *Payton* did not fall into any of these three categories. Without applying the *Stovall* criteria, the Court held that a decision by the Court construing the fourth amendment is to be retroactively applied to all convictions that were not yet final at the time the decision was rendered. The Court went on to say that the holding would not affect those cases which would be clearly controlled by existing retroactivity precedents (e.g., "clear break" cases), that it would not address the question of the retroactive reach of fourth amendment decisions to those cases that may raise fourth amendment issues on collateral attack, and that it would express no view on the retroactive application of decisions construing any constitutional provision other than the fourth amendment.

However, two years later, in *Solem v. Stumes*, 465 U.S. 638, 79 L.Ed. 2d 579 (1984), the Court returned to application of the *Stovall* criteria in determining the retroactivity of a non-fourth amendment claim. In *Stumes*, the Court was faced with the question of whether to apply the ruling in *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981) (which held that once a suspect invoked the right to counsel, any subsequent conversation must be initiated by him), retroactively to *habeas corpus* cases. The opinion's primary discussion of *Johnson* was contained in a footnote where it was said that in that case, "a majority of the Court has recently adopted a slightly different approach in the Fourth Amendment area." *Solem v. Stumes*, 465 U.S. at 643, 79 L.Ed. 2d at 587. However, the Court went on to say that the *Johnson* approach was inapplicable to this case since it was controlled by prior precedent, arose on collateral review, and did not involve the fourth amendment.

While not expressly utilizing the *Johnson* approach, the *Stumes* decision did recognize the importance that attaches to "clear break" cases as alluded to in *Johnson*. The Court stated

that when a "clear break" — as defined in *Johnson* — occurs, the reliance and effect prongs of the *Stovall* test " 'have virtually compelled a finding of nonretroactivity.' " *Solem v. Stumes*, 465 U.S. at 646, 79 L.Ed. 2d at 589 (quoting *United States v. Johnson*, 457 U.S. at 549-50, 73 L.Ed. 2d at 214). The Court concluded that although *Edwards* did establish a new rule, it was not a "clear break" case. After applying the *Stovall* criteria, the Court concluded that *Edwards* should not be applied retroactively to *habeas corpus* proceedings.

In *Shea v. Louisiana*, 470 U.S. 51, 84 L.Ed. 2d 38 (1985), the Supreme Court held that the ruling in *Edwards* was to apply retroactively to cases pending on direct appeal in state court at the time the opinion was rendered. In reaching this conclusion, the Court reviewed the decisions in *Johnson* and *Stumes*. The Court noted that in *Johnson*, it had expressly declined to address the implications of the holding in situations other than fourth amendment issues raised on direct review. However, the Court stated that it saw no reason to reach a result in *Shea* different from that in *Johnson*, saying, "There is nothing about a Fourth Amendment rule that suggests that in this context it should be given greater retroactive effect than a Fifth Amendment rule." *Shea v. Louisiana*, 470 U.S. at 59, 84 L.Ed. 2d at 46. In response to the argument that it is unfair to treat litigants differently based on whether their claim was brought on direct appeal or was presented on collateral review, the Court stated, "The distinction, however, properly rests on considerations of finality in the judicial process. The one litigant already has taken his case through the primary system. The other has not. For the latter, the curtain of finality has not been drawn. Somewhere, the closing must come." *Id.* at 59-60, 84 L.Ed. 2d at 47. Although *Shea* dealt with a fifth amendment ruling, there is nothing in the opinion to suggest that its analysis would not be applicable to other constitutional rulings as well.

In dissent, Justice White argued that the Court was drawing an arbitrary and artificial line for determining the retroactive effect of prior rulings. Furthermore, he argued that the majority was not being consistent, as *Shea* — as well as *Johnson* — left open the possibility that "clear break" rulings would not be retroactive to cases pending on direct review at the time the new decision was rendered. The majority responded to this argument by say-

ing that the question of a different retroactivity rule for "clear break" cases was not raised in *Shea,* as *Stumes* had previously recognized that *Edwards* was not a "clear break" case.

This brief discussion of the issue of the retroactive application of constitutional criminal procedure rulings indicates that the Supreme Court has not been completely consistent in its approach to the question. Indeed, as early as 1971, it had been said that the Court's decisions in this area "became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim." *Mackey v. United States,* 401 U.S. 667, 676, 28 L.Ed. 2d 404, 411 (1971) (Harlan, J., separate opinion). The recent cases of *Johnson, Stumes,* and *Shea* have failed to provide a complete clarification of the issue. *See* 1 W. LaFave and J. Israel, *Criminal Procedure* § 2.9 (1986 Supp.). Specifically, it is now somewhat unclear what standard is to be employed in analyzing whether a ruling is to be applied retroactively. In their treatise on criminal procedure, Professors LaFave and Israel state their opinion as to the current state of the law and the method of analysis which is to be utilized. They feel that if a new ruling is simply a foreshadowed decision which falls in the category of an analogous application of a well-settled constitutional principle or if it is a truly new rule which denies the state's basic authority to try and convict the defendant, the ruling will be accorded full retroactive application. If the ruling does not fall into one of these categories, the stage at which the litigant's case rested at the time of the new ruling must be considered. If the litigant's case was no longer pending on appeal at the time of the new ruling, the Court will employ the *Stovall* criteria to ascertain whether retroactive application is appropriate. If the case was pending on direct review at the time of the new ruling, *Shea* appears to indicate that it will be given full retroactive effect. If the new ruling constitutes a "clear break" case, however, *Johnson* and *Shea* suggest that it will not be applied retroactively even to cases pending on direct review at the time it was rendered. However, it is arguable that if a "clear break" case bears substantially on the truth-finding process, it may be accorded retroactive application. 1 W. LaFave and J. Israel, *Criminal Procedure* § 2.9 (1986 Supp.).

We agree that the mode of analysis suggested by Professors LaFave and Israel appears to reflect the current state of the law in this area as articulated by the Supreme Court in *Johnson,*

*Stumes,* and *Shea.* Application of this method of analysis clearly shows that *Batson* should not be accorded retroactive application even as to cases, such as this, which were pending on direct review at the time *Batson* was rendered.

Initially, it is readily apparent that *Batson* was not a foreshadowed decision which fell in the category of an analogous application of a well-established constitutional principle. It cannot be said that *Batson* involved the application of settled precedents to a new factual situation. *See United States v. Johnson,* 457 U.S. 537, 73 L.Ed. 2d 202. Also, *Batson* did not reject the state's basic authority to try and convict the defendant for the crime charged. Since *Batson* fell into neither of the two "threshold" categories which would mandate automatic retroactive application, we must proceed to consider the stage at which the defendant's case rested when it was rendered.

Since the defendant's case was pending on direct review at the time *Batson* was rendered, *Johnson* and *Shea* would tend to suggest that the ruling would be applicable to him unless it constituted a "clear break" case. As noted previously, the Supreme Court has said that "clear break" cases occur when a ruling expressly overrules a prior precedent of the Court, disapproves a practice the Court has arguably sanctioned, or overturns a long-standing and widespread practice to which the Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. *United States v. Johnson,* 457 U.S. 537, 73 L.Ed. 2d 202. We believe that *Batson* clearly falls into the first category of "clear break" cases. Although *Batson* reaffirmed the well-established principle recognized in *Swain* that the equal protection clause is violated by the state's purposeful or deliberate exclusion of blacks as jurors, it went on to explicitly reject the *Swain* requirement that a defendant show a history of systematic use of peremptory challenges to exclude blacks in order to prevail on an equal protection challenge. Furthermore, a footnote at the conclusion of the opinion for the Court states, "To the extent that anything in *Swain v. Alabama,* 380 U.S. 202 (1965), is contrary to the principles we articulate today, *that decision is overruled."* *Batson v. Kentucky,* 476 U.S. at ---, 90 L.Ed. 2d at 90 (emphasis added). We conclude that *Batson* explicitly rejected the prior *Swain* requirement and unequivocally overruled *Swain.* Therefore, *Batson* constitutes a "clear break" case which is normally

not accorded retroactive effect, even as to cases pending on direct appeal at the time of the new ruling. *See United States v. Johnson,* 457 U.S. 537, 73 L.Ed. 2d 202.

However, *Johnson* appears to intimate, and Professors LaFave and Israel suggest, that those "clear break" cases bearing substantially on the truth-finding process may nevertheless be accorded full retroactive application. Assuming, *arguendo*, that this proposition is correct, *Batson* is not such a case. The Court has said that "[t]he extent to which a condemned practice infects the integrity of the truth-determining process at trial is a 'question of probabilities.'" *Stovall v. Denno,* 388 U.S. at 298, 18 L.Ed. 2d at 1204 (quoting *Johnson v. New Jersey,* 384 U.S. at 729, 16 L.Ed. 2d at 890). Those rulings which can be said to substantially affect the basic truth-finding process have generally been those which either gave an accused the ability to effectively present his case, *e.g., Arsenault v. Massachusetts,* 393 U.S. 5, 21 L.Ed. 2d 5 (1968) (holding retroactive the ruling in *White v. Maryland,* 373 U.S. 59, 10 L.Ed. 2d 193 (1963), that an accused is entitled to counsel at a preliminary hearing); *McConnell v. Rhay,* 393 U.S. 2, 21 L.Ed. 2d 2 (1968) (holding retroactive the ruling in *Mempa v. Rhay,* 389 U.S. 128, 19 L.Ed. 2d 336 (1967), that counsel must be provided at a hearing concerning the revocation of probation), or those which placed restrictions on the prosecution's ability to present improper evidence against an accused, *e.g., Berger v. California,* 393 U.S. 314, 21 L.Ed. 2d 508 (1969) (holding retroactive the ruling in *Barber v. Page,* 390 U.S. 719, 20 L.Ed. 2d 255 (1968), that the absence of a witness from the jurisdiction did not justify the use at trial of preliminary hearing testimony unless the state had made a good faith effort to secure the witness' presence); *Roberts v. Russell,* 392 U.S. 293, 20 L.Ed. 2d 1100, *reh'g denied,* 393 U.S. 899, 21 L.Ed. 2d 191 (1968) (holding retroactive the ruling in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed. 2d 476 (1968), which restricted the use of a confession by a codefendant which implicated the accused). We conclude that while the ruling in *Batson* may tend to incidentally avoid unfairness in the trial, it is not one which bears substantially on the truth-finding process. We note that in *De Stefano v. Woods,* 392 U.S. 631, 20 L.Ed. 2d 1308 (1968), the Supreme Court held that the ruling in *Duncan v. Louisiana,* 391 U.S. 145, 20 L.Ed. 2d 491 (1968) (that the fourteenth amendment guarantees a right to a jury trial in some state court

cases), was not to be applied retroactively. Also, the ruling in *Taylor v. Louisiana*, 419 U.S. 522, 42 L.Ed. 2d 690 (1975) (that exclusion of women from jury venires deprives a state criminal defendant of his constitutional right to trial by an impartial jury drawn from a fair cross-section of the community), was held to be nonretroactive in *Daniel v. Louisiana*, 420 U.S. 31, 42 L.Ed. 2d 790 (1975). If the Supreme Court did not feel that action taken to enforce the right to trial by jury and to prevent the exclusion of women from jury venires did not bear substantially on the truth-finding process, we think it can be safely said that the ruling in *Batson* does not do so either.

In summary, we hold that the ruling in *Batson* is not to be applied retroactively. The ruling will only be applicable to those cases where the jury selection took place after the *Batson* decision was rendered. Since the jury selection in this case took place before *Batson* was decided, we overrule the defendant's argument that the prosecution violated his equal protection rights through the use of its peremptory challenges.

[4] The defendant also contends that the prosecution's use of peremptory challenges violated his sixth and fourteenth amendment right to have the jury drawn from a fair cross-section of the community. The United States Supreme Court has recently held, in the context of a "death qualification" case, that the sixth amendment fair cross-section requirement applies only to the pool from which the petit jurors are selected and imposes no requirement that the petit jurors actually chosen must mirror the community and reflect the various distinctive groups in the population.

The Eighth Circuit ruled that "death qualification" violated McCree's right under the Sixth Amendment . . . to a jury selected from a representative cross-section of the community. But we do not believe that the fair cross-section requirement can, or should, be applied as broadly as that court attempted to apply it. We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. . . . The limited scope of the fair cross-section requirement is a direct and in-

evitable consequence of the practical impossibility of pro-
viding each criminal defendant with a truly "representative"
petit jury . . . . *Pope v. United States,* 372 F. 2d 710, 725
(CA8 1967) (Blackmun, J.) ("The point at which an accused is
entitled to a fair cross-section of the community is when the
names are put in the box from which the panels are drawn"),
vacated on other grounds, 392 U.S. 651 (1968). We remain
convinced that an extension of the fair cross-section require-
ment to petit juries would be unworkable and unsound, and
we decline McCree's invitation to adopt such an extension.

*Lockhart v. McCree,* 476 U.S. 162, ---, 90 L.Ed. 2d 137, 147-48
(1986) (citations omitted); *Taylor v. Louisiana,* 419 U.S. 522, 42
L.Ed. 2d 690 (1975). *See also State v. Elkerson,* 304 N.C. 658, 285
S.E. 2d 784 (1982); *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803
(1980). The defendant has presented no evidence, nor does he con-
tend, that the make-up of the venire panel from which the petit
jury was selected violated the fair cross-section requirement. This
assignment of error is overruled.

Finally, the defendant argues that the trial court erred by
failing to grant his motion to dismiss the charge of first-degree
murder. He claims that the State failed to present sufficient
evidence of premeditation and deliberation to justify the submis-
sion of this charge to the jury. We do not agree.

Before the issue of a defendant's guilt may be submitted to
the jury, the trial court must be satisfied that substantial
evidence has been introduced tending to prove each essential ele-
ment of the offense charged and that the defendant was the per-
petrator. *State v. Hamlet,* 312 N.C. 162, 321 S.E. 2d 837 (1984);
*State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial
evidence must be existing and real, but need not exclude every
reasonable hypothesis of innocence. *State v. Williams,* 308 N.C.
47, 301 S.E. 2d 335, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177,
*reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). In considering
a motion to dismiss, the trial court must examine the evidence in
the light most favorable to the State, and the State is entitled to
every reasonable intendment and inference to be drawn there-
from. *State v. Hamlet,* 312 N.C. 162, 321 S.E. 2d 837; *State v.
Bright,* 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and
discrepancies in the evidence are for the jury to resolve and do

not warrant dismissal. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114.

First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979); N.C.G.S. § 14-17 (1981 and Cum. Supp. 1985). Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808; *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837; *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). The phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome his reason. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768.

Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808; *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 117, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704. We have also held that the nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982).

[5]   We conclude in the present case that there was substantial evidence that the killing was premeditated and deliberate and that the trial court did not err in submitting to the jury the question of defendant's guilt of first-degree murder based on premeditation and deliberation. There was no evidence that Mrs. Kennedy in any way provoked the defendant into attacking her. Following the killing, the defendant callously remarked to Dickey that "somebody [had] messed her up bad." Furthermore, in his statement, the defendant admitted that he had attempted to cover up his involvement in the crime by placing the steel file in the knife rack and by disposing of the murder weapon. The nature of the wound also tends to show that the killing was premeditated and deliberate, as the knife was thrust into Mrs. Kennedy's back with such force that it went completely through her body.

The defendant appears to argue that because his confession was introduced into evidence, the prosecution was bound by that portion of the statement tending to show that the killing occurred in a moment of panic and was not premeditated and deliberate. An unlawful killing is deliberate and premeditated if· done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time, unless such anger or emotion was such as to disturb the faculties and reason. *State v. Whitley*, 311 N.C. 656, 319 S.E. 2d 584 (1984); *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768. There was absolutely no evidence that the defendant's mental faculties were impaired to this extent.

Furthermore, it is well established that the State is not bound by the exculpatory portions of a confession which it introduces if other evidence is presented that tends to rebut or contradict the exculpatory portions of the statement. *E.g., State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 434 U.S. 928, 54 L.Ed. 2d 288 (1977). The defendant implicitly asserts that the stabbing immediately followed the first scream. The State presented evidence which tended to show that as much as thirty to forty-five seconds may have elapsed between Kennedy's initial scream and her final scream. In addition, the physical layout of the crime scene would tend to rebut the notion that the stabbing occurred immediately after the initial scream. Even under defendant's version of the incident, in order to stab the victim, the

defendant would have had to get off the bed; go to the night table, which was some distance from the bed; pick up the knife; and then return to the bed and stab the victim. This would tend to show that some period of time elapsed from the initial scream until the fatal wound was inflicted. The jury could have inferred from the evidence, taken in the light most favorable to the State, that the fatal stab was not inflicted until the time of the second scream, and such inference would support a finding that the killing was premeditated and deliberate. This assignment of error is overruled.

The defendant received a fair trial, free from prejudicial error.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice EXUM dissenting in part.

For the reasons stated in my dissenting opinion, in which Chief Justice Branch and Justice Frye joined, on the first appeal of this issue, I dissent from that portion of the majority opinion which concludes defendant's confession was admissible. *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983) (Exum, J., dissenting). I join in all other aspects of the Court's opinion.

Justice FRYE joins in this dissenting opinion.