IN THE SUPREME COURT OF NORTH CAROLINA

No. 406PA18

Filed 5 June 2020

STATE OF NORTH CAROLINA

v.

CORY DION BENNETT

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 262 N.C. App. 89, 821 S.E.2d 476 (2018), affirming judgments entered on 16 March 2017 by Judge John E. Nobles, Jr., in Superior Court, Sampson County. On 27 March 2019, the Supreme Court allowed the State's conditional petition for discretionary review as to an additional issue. Heard in the Supreme Court on 3 February 2020.

*Joshua H. Stein, Attorney General, by Kristin J. Uicker and Brent D. Kiziah, Assistant Attorneys General, for the State-appellee.*

*Franklin E. Wells, Jr., for defendant-appellant.*

*Donald H. Beskind, Robert S. Chang, and Taki V. Flevaris for Fred T. Korematsu Center for Law and Equality, amicus curiae.*

*David Weiss, James E. Coleman, Jr., and Elizabeth Hambourger for Coalition of State and National Criminal Justice and Civil Rights Advocates, amici curiae.*

ERVIN, Justice.

This case requires us to determine whether the record developed before the trial court sufficed to permit appellate review of a *Batson* challenge lodged by

defendant Cory Dion Bennett and, if so, whether defendant established the existence of the prima facie case of discrimination necessary to require the trial court to undertake a complete *Batson* analysis. After careful review of the record, transcript, and briefs in light of the applicable law, we conclude that defendant presented a sufficient record to allow this Court to conduct a meaningful review of his contention that he did, in fact, establish the necessary prima facie case of discrimination and that he made a sufficient showing to require the performance of a complete *Batson* analysis. As a result, we reverse the decision of the Court of Appeals and remand this case to the Court of Appeals for further remand to the Superior Court, Sampson County, for a hearing to be conducted in accordance with the final two steps of the analysis delineated by the Supreme Court of the United States in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

On 25 April 2016, the Sampson County grand jury returned bills of indictment charging defendant with three counts of possessing a precursor chemical with the intent to manufacture methamphetamine, one count of manufacturing methamphetamine, one count of trafficking in methamphetamine by possession, one count of trafficking in methamphetamine by manufacture, and one count of possession of a firearm by a felon. On 6 June 2016, the Sampson County grand jury returned a bill of indictment charging defendant with two additional counts of possessing a precursor chemical with the intent to manufacture methamphetamine.

The charges against defendant came on for trial before the trial court and a jury at the 13 March 2017 criminal session of the Superior Court, Sampson County. Among the first twelve persons seated in the jury box during the voir dire process was Roger Smith, who occupied Seat No. 10. Mr. Smith, an unmarried man, lived off H.B. Lewis Road and worked as a termite supervisor in Clinton. In response to the prosecutor's inquiry concerning whether any prospective juror had "ever been the victim of a crime," Mr. Smith responded that he had been the victim of a breaking or entering that had occurred approximately two years earlier; that, while law enforcement officers had investigated the incident, no one had ever been charged with the commission of the crime; and that Mr. Smith believed that the investigating officers had handled the incident in a satisfactory manner. In addition, Mr. Smith informed the prosecutor that, while he recognized one of the other prospective jurors, who worked at a local bank, his connection with this other prospective juror would not affect his ability to decide the case fairly and impartially in the event that he was selected to serve as a member of the jury.

Mr. Smith responded to prosecutorial inquiries concerning whether anything would make it difficult for him to be a fair and impartial juror and whether there was anything going on in his life that would make it difficult for him to serve on the jury in the negative. Similarly, Mr. Smith denied having any religious, moral, or ethical concerns that would prevent him from voting to return a guilty verdict. After questioning other prospective jurors, the prosecutor exercised a peremptory challenge

to remove Mr. Smith from the jury being selected to decide the issue of defendant's guilt or innocence.

After a ten-minute recess, Virginia Brunson was called to replace Mr. Smith in Seat No. 10. Ms. Brunson responded to the trial court's initial questions by stating that she was not aware of any reason that she would be unable to be fair to either the State or defendant. Ms. Brunson, who was not married, lived near Ingold and owned a beauty salon that was located across the street from the courthouse. After stating that she did not know anyone involved in the prosecution or defense of the case or any of the other prospective jurors, Ms. Brunson told the prosecutor that she had never been the victim of crime, a defendant or witness in a case, or a juror. In addition, Ms. Brunson stated that she did not have any strong feelings, either favorable or unfavorable, concerning the law enforcement profession; that she had not heard anything about the charges against defendant before arriving for jury selection; and that she would be able to be impartial to both sides. Similarly, Ms. Brunson expressed no reservations concerning the fact that possession of a firearm by a felon is unlawful and said that she was not confused by the distinction between the concepts of actual and constructive possession.

Ms. Brunson stated that she would be able to listen to and fairly consider the testimony of a witness who had entered into a plea agreement with the State, that she did not know any of the other prospective jurors who were seated in the jury box with her, and that she understood that legal dramas on television were not realistic.

To Ms. Brunson's knowledge, neither she, a member of her family, nor a close friend had ever had a negative experience with a member of the law enforcement profession or a member of the District Attorney's staff or had ever been charged with committing an offense other than speeding.

In response to further prosecutorial questioning, Ms. Brunson stated that she understood that defendant was presumed to be innocent; that he possessed the rights to a trial by jury, to call witnesses to testify in his own behalf, and to refuse to testify; and that any refusal on his part to testify in his own behalf could not be held against him. Moreover, Ms. Brunson stated that she understood the difference between direct and circumstantial evidence, that she understood that the State was required to establish defendant's guilt beyond a reasonable doubt, and that she would be required as a member of the jury to assess the credibility of the witnesses.

Ms. Brunson assured the prosecutor that she could listen to all of the evidence, keep an open mind, and follow the law in accordance with the trial court's instructions; agreed with the prosecutor's comment that "the law is not always what we think it is or what we would like it to be"; and acknowledged that, in the event that she was selected to serve as a juror in this case, she would be required to follow the law and apply the law set out in the trial court's instructions to the facts. At that point, the following colloquy occurred between the prosecutor and Ms. Brunson:

> MR. THIGPEN: Do you think you could reach a verdict based only on hearing the evidence from the witness stand, or do you feel like in order to reach a verdict or to make a

decision you would have to actually watch the alleged event happen?

MS. BRUNSON:     Yeah.

MR. THIGPEN:     Okay.  You looked confused.  Some people—I have had jurors before that have said, "I can't make a decision until I see it happen."

MS. BRUNSON:     Uh-huh.

MR. THIGPEN:     Okay.  Do you feel like you could base your decision on just what the witnesses say, or do you feel like you have to watch it happen?

MS. BRUNSON:     Kind of on both.

MR. THIGPEN:     What do you mean?

MS. BRUNSON:     Sometimes, I guess, it's better to not have hearsay.

MR. THIGPEN:     Well, if you watched it happen, you would be a witness; right?

MS. BRUNSON:     Right.

MR. THIGPEN:     And if you were a witness, you can't be a juror.  Does that make sense?

MS. BRUNSON:     Yes.

MR. THIGPEN:     So the only thing we have is witness testimony.

MS. BRUNSON:     Okay.

MR. THIGPEN:     So do you feel like you could make a decision based only on hearing the testimony of the witnesses or before you could make that decision would you actually want to watch it happen?

MS. BRUNSON:     Yeah.

MR. THIGPEN:     Okay.  What you said was, "Yeah."

MS. BRUNSON:     Yeah, I could make that decision through—

MR. THIGPEN:     Based on the testimony?

MS. BRUNSON:     Uh-huh.

After reiterating that nothing would make it difficult for her to be fair and impartial to either side and that nothing was going on in her life outside of the courtroom that would render jury service unduly burdensome, Ms. Brunson stated that she did not have any religious, moral, or ethical concerns about voting for a guilty verdict in the event that the State satisfied its burden of proof.  At the conclusion of this line of questioning, the State peremptorily challenged Ms. Brunson.

At that point, Rita Corbett took Ms. Brunson's place in Seat No. 10.  In responding to the trial court's initial questions, Ms. Corbett stated that there was no reason that she could not be fair to either the State or defendant.  Ms. Corbett lived in Clinton, worked as a child nutrition supervisor for the Clinton City Schools, and was married to a person who had retired from his employment with Duke Energy.  In response to prosecutorial questions, Ms. Corbett said that she did not know the prosecutor, defendant, or defendant's attorney.  Ms. Corbett denied having ever been the victim of a crime, a defendant, or a witness in a case.  However, Ms. Corbett had served as a member of a criminal jury in Sampson County about thirty years earlier.

According to Ms. Corbett, the jury upon which she served had deliberated on the case, she had not served as the foreperson of the jury, and nothing about that experience would impact her ability to serve on the present jury.

Ms. Corbett denied having strong feelings, either favorable or unfavorable, about the law enforcement profession and indicated that she had not read, heard, or seen anything about the charges against defendant before arriving in court for jury service. In addition, Ms. Corbett denied having any reservations about the fact that felons are prohibited from possessing firearms and expressed no confusion about the difference between actual and constructive possession. During a colloquy with the prosecutor, Ms. Corbett gave the following answers:

> MR. THIGPEN: Okay. Now, Ms. Corbett, a witness may testify on behalf of the State as a result of a plea agreement with the State in exchange for [a] sentence concession. Based on that fact and that fact alone, would you not be able to consider that person's testimony along with all other evidence that you would hear in the case?
>
> MS. CORBETT: Yes, sir. No, sir.
>
> MR. THIGPEN: Do you understand my question?
>
> MS. CORBETT: Say it again.
>
> MR. THIGPEN: A witness may testify under a plea agreement in exchange for a sentence concession.
>
> MS. CORBETT: Okay.
>
> MR. THIGPEN: Now if that person were to testify, are you just going to go, [t]his person's made a deal; I don't care

what they are going to say, or would you listen to it and consider it just like anybody else?

MS. CORBETT:    I would listen to their testimony and consider it.

Ms. Corbett did not know any of the other prospective jurors and understood that legal dramas were not based upon reality.

Ms. Corbett told the prosecutor that neither she, a member of her family, nor a close friend had ever had an unpleasant experience with a law enforcement officer or a member of the District Attorney's staff. Ms. Corbett acknowledged that certain drug charges involving her brother had been resolved, stated that she felt that the law enforcement officers involved in that situation had treated her brother fairly, and said that nothing about that experience would affect her ability to be a fair and impartial juror. Ms. Corbett understood that defendant was presumed to be innocent until proven guilty beyond a reasonable doubt; that he possessed the right to trial by jury, to call witnesses in his own behalf, and to refuse to testify; and that any decision that he might make to refrain from testifying in his own behalf could not be held against him.

Ms. Corbett told the prosecutor that she understood the difference between direct and circumstantial evidence and that, as a member of the jury, she would be required to assess the credibility of the witnesses. Ms. Corbett expressed confidence in her ability to listen to all of the evidence, keep an open mind, and follow the law in accordance with the trial court's instructions. Ms. Corbett agreed with the prosecutor

that "the law is not always what we think the law is or what you think it should be" and that, as a juror, she would be required to use common sense, follow the law, and apply the law to the facts. In addition, Ms. Corbett stated that she "would not have to see the event happen"; that she could reach a verdict based upon the testimony of witnesses; and that she did not know of anything that would make it difficult for her to be fair and impartial to both the State and defendant.

When the prosecutor inquired whether there was anything occurring in her life outside of the courtroom that would make jury service difficult, Ms. Corbett mentioned her work-related obligations and stated that she was supposed to take her daughter-in-law to a doctor's appointment. On the other hand, Ms. Corbett agreed that the other prospective jurors probably had similar employment-related concerns and acknowledged that her daughter-in-law could use some other means to get to her appointment. Finally, Ms. Corbett stated that she did not have any religious, moral, or ethical concerns that would prevent her from voting to return a guilty verdict. At the conclusion of this line of questioning, the State accepted Ms. Corbett as a juror.

After the State announced this decision, defendant's trial counsel informed the trial court that she wished to make a *Batson* motion and asked to be heard. In response, the trial court inquired of defendant's trial counsel concerning whether the motion could be heard after a break. After agreeing that the *Batson* motion could be heard after the court broke for lunch, defendant's trial counsel proceeded to question

the prospective jurors. After excusing the prospective jurors for lunch, the trial court allowed defendant's trial counsel to make a *Batson* motion.

In seeking relief pursuant to *Batson*, defendant's trial counsel stated that "the basis of my motion goes to the fact that in Seat Number[ ] 10, we had two jurors, [Mr. Smith] and [Ms. Brunson], both of whom were black jurors, and both of whom were excused." According to defendant's trial counsel, the voir dire examination of both Mr. Smith and Ms. Brunson indicated that "there was no overwhelming evidence, there was nothing about any prior criminal convictions, any feelings about—towards or against law enforcement, there's no basis, other than the fact that those two jurors happen to be of African[ ]American de[s]cent [and] they were excused." In response, the prosecutor stated that "I don't think [defendant's trial counsel] made a prima facie showing [of] discriminatory intent, which is required under Batson," and that "[t]he simple fact that both jurors happen to have been African[ ]American and I chose to excuse them peremptorily, is not sufficient to raise a Batson challenge."

At the conclusion of the prosecutor's remarks, the trial court inquired, with reference to the prosecutor's pattern of exercising the State's peremptory challenges, that it "[s]eems to me that you excused two, but kept three African[ ]Americans. Am I right?" After agreeing with the trial court's observation, the prosecutor identified the three African American prospective jurors that he had accepted. At that point, the trial court stated that "I don't see where you've overcome or made a prima facie showing of lack of neutrality" and asked defendant's trial counsel why she had

excused three "White Americans, I guess." In responding to the trial court's question, defendant's trial counsel asserted that her decision to exercise those challenges "had nothing to do with [the jurors'] race" and stated that she had peremptorily challenged one prospective juror because the juror had been the victim of a crime and had served on a jury. At that point, the prosecutor claimed that those reasons applied equally to another prospective juror who had not been the subject of a peremptory challenge, leading the trial court to respond, "[t]hat's what I was talking about." After stating that there were additional reasons for the peremptory challenges that she had exercised, defendant's trial counsel reiterated that "race was not a part of it." In denying defendant's *Batson* motion, the trial court stated that:

> Madam Clerk, the Court, from the evidence, the arguments of counsel on the record, the Court finds there is no evidence of a showing of prejudice based on race or any of the contentions in Batson . . . . The Court further finds that out of the five jurors who were African[ ]American, three still remain on the panel and have been passed by the State. The Court concludes there is no prima facie showing justifying the Batson challenge; therefore, the defendant's motion is denied.

On 16 March 2017, the jury returned verdicts convicting defendant of five counts of possessing a precursor chemical, one count of manufacturing methamphetamine, one count of trafficking in methamphetamine by possession, and one count of trafficking in methamphetamine by manufacture and acquitting defendant of possession of a firearm by a felon. After accepting the jury's verdicts, the trial court consolidated three of defendant's convictions for possessing a precursor

chemical for judgment and entered a judgment sentencing defendant to a term of 28 to 43 months imprisonment; entered a second judgment based upon defendant's conviction for manufacturing methamphetamine sentencing defendant to a concurrent term of 120 to 156 months imprisonment; consolidated defendant's remaining two convictions for possessing a precursor chemical for judgment and entered a third judgment sentencing defendant to a concurrent term of 28 to 43 months imprisonment; and consolidated defendant's two convictions for trafficking in methamphetamine for judgment and entered a fourth judgment sentencing defendant to a concurrent term of 90 to 117 months imprisonment. Defendant noted an appeal from the trial court's judgments to the Court of Appeals.

In seeking relief from the trial court's judgments before the Court of Appeals, defendant argued that the trial court had erred by denying his *Batson* motion on the grounds that "there was prima facie evidence that the prosecutor's use of peremptory strikes was racially motivated." In defendant's view, "[t]he trial [court] . . . based [its] denial of the motion on an apparent belief that because the prosecutor had accepted some black jurors, the exercise of the challenged peremptory strikes could not possibly have been improper." According to defendant, the prosecutor had utilized 100% of his peremptory challenges to excuse African American prospective jurors while the prosecutor accepted 100% of the white jurors that he had questioned. The State responded that the trial court's conclusion with respect to defendant's *Batson* motion was "not clearly erroneous" and that "the record is insufficient to permit

proper appellate review of the *Batson* issue" because "neither the [r]ecord nor [t]ranscript reveals that [d]efendant at any time made a motion to record the race of prospective jurors."[1]

In an opinion finding no error in the proceedings leading to the entry of the trial court's judgments, the Court of Appeals held that defendant had "failed to make a *prima facie* case that the State's challenges were racially motivated." *State v. Bennett*, 262 N.C. App. 89, 90, 821 S.E.2d 476, 479 (2018). As an initial matter, the Court of Appeals addressed the issue of whether the record contained sufficient information to permit a proper determination of the merits of defendant's challenge to the trial court's *Batson* ruling, with its inquiry into this issue focusing upon the extent to which the record sufficiently established the race of each of the relevant prospective jurors. *Id.* at 92–98, 821 S.E.2d at 481–84. After noting that defendant's trial counsel had identified Mr. Smith and Ms. Brunson as African American in the course of making the *Batson* motion, that the prosecutor had agreed with the assertion of defendant's trial counsel, and that the trial court had found that Mr. Smith and Ms. Brunson were African American in its findings of fact, the Court of Appeals stated that, "[f]or proper review of [the] denial of a *Batson* challenge, it is

---

[1] In addition, defendant argued before the Court of Appeals that the trial court had erred "by giving an acting in concert instruction when the evidence failed to support an inference that [defendant and another individual] were acting together in the commission of any crime." In view of the fact that the Court of Appeals rejected defendant's challenge to the trial court's acting in concert instruction and that defendant has made no effort to bring that issue forward for our consideration, we will refrain from discussing the acting in concert issue any further in this opinion.

necessary that the record establishes the race of any prospective juror that the defendant contends was unconstitutionally excused for [a] discriminatory purpose by peremptory challenge." *Id.* at 93, 821 S.E.2d at 481.

In making this determination, the Court of Appeals referenced this Court's decision in *State v. Mitchell*, in which we held that

> [i]f a defendant in cases such as this believes a prospective juror to be of a particular race, *he can bring this fact to the trial court's attention and ensure that it is made a part of the record*. Further, *if there is any question as to the prospective juror's race*, this issue should be resolved by the trial court based upon questioning of the juror *or other proper evidence*.

*Bennett*, 262 N.C. App. at 93, 821 S.E.2d at 481 (cleaned up) (quoting *State v. Mitchell*, 321 N.C. 650, 656, 365 S.E.2d 554, 557 (1988)). The Court of Appeals reasoned that, "[i]f there is *not* any question about a prospective juror's race, neither the defendant nor the trial court is required to make inquiry regarding that prospective juror's race." *Id.* (citation omitted). After noting that a "trial court has broad discretion in overseeing *voir dire*" and that *Batson* challenges are reviewed for whether the trial court's findings are clearly erroneous, the Court of Appeals stated that, "[w]here the record is silent upon a particular point, it will be presumed that the trial court acted correctly in performing his judicial acts and duties." *Id.* at 94–95, 821 S.E.2d at 482 (citations omitted) (stating that "the *judge's* subjective impressions are not only relevant, but an integral part of the judge's duties"). As a result, the Court of Appeals held that, "if the trial court determines that it can reliably infer the race of a

prospective juror based upon its observations during *voir dire*, and it thereafter makes a finding of fact based upon its observations, a defendant's burden of preserving that prospective juror's race for the record has been met," and, "[a]bsent evidence to the contrary, it will be presumed that the trial court acted properly—i.e. that the evidence of the prospective juror's race was sufficient to support the trial court's finding in that regard." *Id.* at 95, 821 S.E.2d at 482 (citation omitted). In view of the fact that "[n]othing in the appellate opinions of this State require[s] the trial court to engage in needless inquiry if a prospective juror's race is 'clearly discernable' without further inquiry," the Court of Appeals stated that "the record demonstrates that it was 'clearly discernable' to the trial court, and the attorneys for the State and [d]efendant, that five of the [twenty-one] prospective jurors questioned on *voir dire* were African[ ]American, and that two prospective jurors were excused pursuant to peremptory challenges by the State." *Id.* at 96, 821 S.E.2d at 482–83. On the other hand, after concluding that defendant had properly preserved his *Batson* challenge for purposes of appellate review, the Court of Appeals simply stated with respect to the merits of defendant's claim that, "[a]ssuming, *arguendo*, that defendant's argument is properly before us, we find no error in the ruling of the trial court and affirm." *Id.* at 98, 821 S.E.2d at 484.

In an opinion concurring in the Court of Appeals' decision to reject defendant's *Batson* claim, Judge Berger stated that he would have concluded that defendant "waived review of his *Batson* challenge because he failed to preserve an adequate

record setting forth the race of the jurors." *Bennett*, 262 N.C. App. at 100, 821 S.E.2d at 485 (Berger, J., concurring) (stating that "findings as to the race of jurors may not be established by the subjective impressions or perceptions of 'the defendant, *the court*, counsel' or other court personnel" (cleaned up) (quoting *Mitchell*, 321 N.C. at 655, 365 S.E.2d at 557)). According to Judge Berger, this Court has required "further inquiry regarding each juror's race . . . because perceptions and subjective impressions—standing alone—are insufficient to establish jurors' races." *Id.* at 102, 821 S.E.2d at 486. On 27 March 2019, this Court allowed defendant's petition for discretionary review to address the issue of whether the Court of Appeals had erred by upholding the trial court's decision to deny defendant's *Batson* motion and allowed the State's conditional petition for discretionary review to determine whether the Court of Appeals had erred by concluding that the record provided sufficient evidence of the race of the relevant prospective jurors to permit appellate review of the denial of defendant's *Batson* motion.

In seeking to convince this Court that the trial court and the Court of Appeals erred by concluding that defendant had failed to establish a prima facie case of discrimination, defendant argues that "[t]he prosecutor's exercise of 100 percent of his peremptory challenges to remove black jurors while accepting 100 percent of white jurors raised a *prima facie* case of purposeful discrimination under *Batson* and required the trial court and Court of Appeals to engage in further analysis and investigation." According to defendant, "[t]here was sufficient evidence of the race of

the jurors excused by improper peremptory challenges to permit meaningful review" given that "there was no dispute about the race of jurors questioned by the parties" and that "[t]he prosecutor, defense lawyer, and judge were unanimous in their determination of the races of the potential jurors during the first round of [jury selection]." According to defendant, this Court held in *Mitchell* "that if there is no question about a prospective juror's race, no further inquiry is required." Moreover, defendant asserts that he did, in fact, make out a prima facie case of discrimination as required by *Batson* and contends that the trial court "failed to conduct any serious analysis of the claim" because it "focused on the number of black jurors accepted by the State, to the exclusion of any discussion or consideration of the two black jurors excluded"; "ignored the statistical disparity between strike and acceptance rates for black and white jurors"; and "misunderstood the law."

In seeking to convince us that defendant's challenge to the rejection of his *Batson* claim lacks merit, the State begins by contending that "[d]efendant makes no argument that the Court of Appeals erred" and asserts that we should dismiss defendant's appeal because "[d]efendant's assertion that the Court of Appeals analyzed the issue 'in a summary fashion' does not show the Court of Appeals erred." In addition, the State argues that "[d]efendant waived review . . . by failing to establish an adequate record" on the grounds that a "juror's self-identification of his or her race is an approved method of establishing a sufficient record" while "[t]he subjective impressions of court personnel are not an approved method for establishing

a juror's race," citing *State v. Payne*, 327 N.C. 194, 198, 394 S.E.2d 158, 160 (1990),

and *State v. Brogden*, 329 N.C. 534, 546, 407 S.E.2d 158, 166 (1991).  According to

the State, this Court's precedent supports a "common-sense conclusion that the best

source of information about a person's race is asking that person directly," with the

absence of such information in this case being sufficient to preclude meaningful

appellate review.  The State further contends that "[d]efendant's arguments based on

statistics, made for the first time on appeal, are not properly before this Court."

Finally, assuming that this Court reaches the merits of defendant's *Batson* claim, the

State asserts that "[d]efendant failed to establish a *prima facie* case of intentional

discrimination against prospective jurors based on race" given the absence of

"sufficient evidence to draw an inference that discrimination occurred" and

defendant's failure to point to any "circumstances showing race to be a relevant

factor" in the prosecutor's peremptory challenges.

Thirty-four years ago, the Supreme Court deemed purposeful discrimination

in jury selection to be an equal protection violation in *Batson*, 476 U.S. at 88–89, 106

S. Ct. at 1718–19, 90 L. Ed. 2d at 82–83.  A court required to determine whether a

prosecutor impermissibly exercised a peremptory challenge based upon a prospective

juror's race in violation of *Batson* must engage in the following three-step analysis:

> First, the party raising the claim must make a prima facie
> showing of intentional discrimination under the totality of
> the relevant facts in the case.  Second, if a prima facie case
> is established, the burden shifts to the State to present a
> race-neutral explanation for the challenge.  Finally, the

> trial court must then determine whether the defendant has
> met the burden of proving purposeful discrimination.

*State v. Waring*, 364 N.C. 443, 474–75, 701 S.E.2d 615, 636 (2010) (cleaned up) (citations omitted). A trial court's findings with respect to the issue of whether a defendant has made out a prima facie case of discrimination "will be upheld on appeal unless they are clearly erroneous," *State v. Taylor*, 362 N.C. 514, 528, 669 S.E.2d 239, 254 (2008), with such a "clear error" being deemed to exist when, "on the entire evidence [the Court is] left with the definite and firm conviction that a mistake has been committed." *Id.* (cleaned up) (quoting *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005)). As a result, while a reviewing court is not entitled to choose between "two permissible views of the evidence," *State v. Lawrence*, 352 N.C. 1, 14, 530 S.E.2d 807, 816 (2000), "deference does not by definition preclude relief" under the "clearly erroneous" standard. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196, 214 (2005) (cleaned up) (quoting *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931, 952 (2003)).

In order to preserve a *Batson* challenge for purposes of appellate review, "[a]n appellant must make a record which shows the race of a challenged juror." *State v. Willis*, 332 N.C. 151, 162, 420 S.E.2d 158, 162 (1992) (citing *Mitchell*, 321 N.C. at 650, 365 S.E.2d at 554). In *Mitchell*, the defendant had "filed a motion to require the court reporter to note the race of every potential juror examined to perfect the record and

determine if there was a substantial likelihood that any jurors were challenged on the basis of race." *Mitchell*, 321 N.C. at 653, 365 S.E.2d at 556. This Court upheld the trial court's decision to deny the defendant's motion on the grounds that, "[a]lthough this approach *might* have preserved a proper record from which an appellate court could determine if any potential jurors were challenged solely on the basis of race, we find it inappropriate," *id.* at 655, 365 S.E.2d at 557, given that "[t]o have a court reporter note the race of every potential juror examined would require a reporter alone to make that determination *without the benefit of questioning by counsel or any other evidence* that might tend to establish the prospective juror's race." *Id.* (emphasis added). According to this Court, "[t]he court reporter . . . is in no better position to determine the race of each prospective juror than the defendant, the court, or counsel" because "[a]n individual's race is not always easily discernible, and the potential for error by a court reporter acting *alone* is great." *Id.* at 655–56, 365 S.E.2d at 557 (emphasis added). Thus, we held that, in the event that a defendant "believes a prospective juror to be of a particular race, he can bring this fact to the trial court's attention and ensure that it is made a part of the record." *Id.* at 656, 365 S.E.2d at 557. "[I]f there is any question as to the prospective juror's race, this issue should be resolved by the trial court based upon questioning of the juror *or other proper evidence*, as opposed to leaving the issue to the court reporter who may not make counsel aware of the doubt." *Id.* (emphasis added). As a result, our decision in *Mitchell* prohibits a single individual, either a court reporter, the trial court, or an

attorney, from determining the racial identification of a prospective juror based upon nothing more than that individual's subjective impressions, with the required racial identification determination having to rest upon the questioning of the juror at issue or other proper evidence developed in consultation with counsel for the parties and the trial court.

Subsequently, this Court refused to credit a subjective determination of the racial identification of prospective jurors that had been made by one of the defendant's attorneys in *Payne*, 327 N.C. at 194, 394 S.E.2d at 158. In *Payne*, "[t]he defendant requested that the courtroom clerk record the race and sex of the 'prospective' jurors who had already been seated or excused, but the trial court denied his request." *Id.* at 198, 394 S.E.2d at 159. "The next morning, the defendant renewed his objection via a written motion for the clerk to record the race and sex of jurors," with this request being "supported by an affidavit, subscribed by one of the defendant's attorneys, purporting to contain the name of each black prospective juror examined to that point, and whether the State had peremptorily excused, challenged for cause, or passed the prospective juror to the defense." *Id.* at 198, 394 S.E.2d at 159–60. After "viewing the affidavit's allegations as true," the trial court "nonetheless ruled that the defendant had failed to make a prima facie showing" that the State exercised its peremptory challenges in a discriminatory manner. *Id.* at 198, 394 S.E.2d at 160. This Court however, did not reach the merits of whether the defendant had made out a prima facie case of discrimination and, instead, acting in

reliance upon *Mitchell*, determined that "we are not presented with a record on appeal which will support the defendant's argument." *Id.* In light of the fact that the trial court had stated that, "had the defendant made his motion prior to jury selection, the court would have had each prospective juror state his or her race during the court's initial questioning," *id.* at 200, 394 S.E.2d at 160, this Court concluded that the trial court's proposed approach "would have provided the trial court with an accurate basis for ruling on the defendant's motion, and would also have preserved an adequate record for appellate review," *id.*, with the problem arising from the use of an after-the-fact affidavit executed by defendant's trial counsel to establish the racial identification of the prospective jurors being that it "contained only the perceptions of one of the defendant's lawyers concerning the races of those excused—perceptions no more adequate than the court reporter's or the clerk's would have been, as we recognized in *Mitchell*." *Id.* at 200, 394 S.E.2d at 161 (citing *Mitchell*, 321 N.C. at 655–56, 365 S.E.2d at 557).[2] *See also Brogden*, 329 N.C. at 546, 407 S.E.2d at 166 (holding that the defendant "failed to carry his burden of establishing an adequate record for appellate review" where "the only records of the potential jurors' race preserved for appellate review are the subjective impressions of [the] defendant's

---

[2] Our opinion in *Payne* makes no reference to the existence of a stipulation. Instead, the State refrained from commenting upon the sufficiency of the defendant's proof in the trial court and did not challenge the adequacy of defendant's showing of the racial identities of the prospective jurors before this Court. We are unable to conclude that *Payne* involved a stipulation in light of these facts and the applicable law, which is discussed later in this opinion.

counsel and notations made by the court reporter of her subjective impressions with regard to race").

A careful review of the record presented for our consideration in this case satisfies us that the majority of the Court of Appeals correctly determined that the record contains sufficient information to permit us to review the merits of defendant's *Batson* claim. Unlike the situations at issue in *Mitchell*, *Payne*, and *Brogden*, in which the defendant attempted to establish the racial identities of each of the prospective jurors on the basis of the subjective impressions of a limited number of trial participants, the record in this case establishes that defendant's trial counsel, the prosecutor, and the trial court each agreed that Mr. Smith and Ms. Brunson were African American. In other words, the record reveals the complete absence of any dispute among counsel for the parties and the trial court concerning the racial identity of the persons who were questioned during the jury selection process, with this agreement between counsel for the parties and the trial court making this case fundamentally different from *Mitchell*, *Payne*, and *Brogden* and resulting in what amounts to a stipulation of the racial identity of the relevant prospective jurors. *See Smith v. Beasley*, 298 N.C. 798, 800, 259 S.E.2d 907, 909 (1979) (stating that "[a] stipulation is an agreement between the parties establishing a particular fact in controversy" (citing *Rural Plumbing and Heating, Inc. v. H.C. Jones Constr. Co.*, 268 N.C. 23, 31, 149 S.E.2d 625, 631 (1966))). While "[a] stipulation must be 'definite and certain in order to afford a basis for judicial decision,' " *State v. Hurt*, 361 N.C. 325,

329, 643 S.E.2d 915, 918 (2007) (quoting *State v. Powell*, 254 N.C. 231, 234, 118 S.E.2d 617, 619 (1961)), "stipulations and admissions may take a variety of forms and may be found by implication." *Id.* at 330, 643 S.E.2d at 918 (citing *State v. Mullican*, 329 N.C. 683, 686, 406 S.E.2d 854, 855–56 (1991)); *see also State v. Alexander*, 359 N.C. 824, 826, 830, 616 S.E.2d 914, 916, 918 (2005) (holding that the defendant's trial counsel had stipulated to the accuracy of a prior record worksheet by stating that his client "is a single man and up until this particular case he had no felony convictions, as you can see from his worksheet"). "Where facts are stipulated, they are deemed established as fully as if determined by jury verdict" or the trial court. *Smith*, 298 N.C. at 800–01, 259 S.E.2d at 909 (citing *Moore v. Humphrey*, 247 N.C. 423, 430, 101 S.E.2d 460, 466–67 (1958)).

In accordance with this fundamental legal proposition, this Court has accepted without any adverse comment the use of a stipulation for the purpose of establishing the racial identities of prospective jurors for the purpose of reviewing a defendant's *Batson* challenge.[3] *See State v. Jackson*, 322 N.C. 251, 368 S.E.2d 838 (1988). In *Jackson*, which was decided almost two months after *Mitchell,* "[t]he selection of the jury at the trial of this case was not transcribed." *Id.* at 252, 368 S.E.2d at 838. Even so, "[t]he attorneys who represented the defendant at trial and [one of the State's

---

[3] *Jackson* contains no indication that the procedural posture in which the case was heard on remand from the Supreme Court of the United States had any bearing upon the acceptability of the method of proving the racial identities of the prospective jurors utilized in that case.

attorneys] stipulated what happened at the trial," with these stipulated facts including a recognition "that the State used five peremptory challenges to remove four blacks and one white from the jury." *Id.* at 252–53, 368 S.E.2d at 838–39. On appeal, this Court used the stipulation of counsel for the parties, the notes taken by trial counsel for the parties, and an affidavit from one of the prosecutors who had represented the State at trial in order to evaluate the validity of defendant's *Batson* argument. *Id.* at 252, 368 S.E.2d at 839. We are unable to distinguish what this Court appears to have found acceptable in *Jackson* from the events depicted in the record before us in this case, in which defendant's trial counsel stated that Mr. Smith and Ms. Brunson "were black jurors," the prosecutor agreed to "[t]he simple fact that both jurors happen to have been African[ ]American and [he had] chose[n] to excuse them," the prosecutor claimed that he had passed three other African American prospective jurors, and the trial court found as a fact that, "out of the five jurors who were African[ ]American, three still remain on the panel and have been passed by the State." In view of the fact that the racial identification of the relevant prospective jurors was not in dispute between the parties, that the prosecutor acknowledged having peremptorily challenged two of the five African American prospective jurors that had been tendered for the State's consideration, that the agreement of the parties amounted to a stipulation concerning the racial identity of the relevant prospective jurors, and that the trial court's findings reflected the terms of this implicit agreement in its findings, there was nothing to be "resolved by the trial court

based upon questioning of the juror or other proper evidence." *Mitchell*, 321 N.C. at 656, 365 S.E.2d at 557.[4] As a result, given that our prior decisions clearly allow for the use of methods other than self-identification[5] for the purpose of determining the racial identity of prospective jurors for the purpose of deciding the merits of a *Batson* claim and given our failure, during the course of our research, to find a decision from any other American jurisdiction precluding the use of any method for determining the racial identities of prospective jurors for purposes of evaluating the merits of a *Batson* claim other than the juror's racial self-identification, we hold that the record before us in this case is sufficient to permit us to review the merits of defendant's *Batson* claim.[6]

---

[4] The ultimate issue raised by a *Batson* challenge—whether the prosecutor is excluding people from a jury because of their race—involves "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S. Ct. 1712, 1721, 90 L. Ed. 2d 69, 85 (1986) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 564, 50 L. Ed. 2d 450, 465 (1977)). At oral argument, counsel for the State argued that "[w]hether the prosecutor accurately or inaccurately assesses [a juror's] race is . . . irrelevant to the reason that they have chosen or not chosen to strike them" on the grounds that, "in using the peremptory challenge, if [the prosecutor] ha[s] decided that they want to strike this person because they believe them to be of X race but they are not in fact of that race, that would still be an impermissible challenge to that person." The logic upon which this argument rests provides further support for our conclusion that the record before us in this case is sufficient to permit appellate review of defendant's *Batson* claim.

[5] A prospective juror's answer to a question concerning his or her racial identity contained on a jury questionnaire is simply another form of juror self-identification.

[6] According to the State, defendant has failed to argue that the Court of Appeals erred by upholding the trial court's *Batson* ruling and has improperly advanced statistical arguments that he failed to make in the courts below. We reject any contention that litigants must use any particular semantic formulation in the petitions or briefs that are filed with this Court in order to properly preserve a claim for appellate review. As the record clearly reflects, defendant's successful discretionary review petition raises the issue of "[w]hether

This Court has stated that "[s]tep one of the *Batson* analysis, a *prima facie* showing of racial discrimination, is not intended to be a high hurdle for defendants to cross" and that "the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge." *State v. Hoffman*, 348 N.C. 548, 553, 500 S.E.2d 718, 722 (1998). This Court has identified several factors that are relevant in considering whether a defendant has established the existence of the necessary prima facie case, including:

> the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995). Although a numerical analysis of strike patterns "is not necessarily dispositive" in determining that the defendant has succeeded in making out a prima facie case, such an analysis "can be useful in helping us and the trial court determine whether a *prima facie* case of

---

the Court of Appeals erred in sustaining the trial court's ruling denying defendant's *Batson* motion," with the relatively limited analysis in which the Court of Appeals engaged before rejecting defendant's *Batson* claim on the merits being no barrier to consideration of defendant's claim before this Court. Moreover, the trial court raised the statistical issue in noting that the State had accepted three African American prospective jurors and asked defendant's trial counsel why she had peremptorily challenged three white prospective jurors. Finally, defendant advanced a statistics-based argument in his brief before the Court of Appeals. As a result, the merits of defendant's *Batson* claim are properly before this Court.

discrimination has been established." *State v. Barden*, 356 N.C. 316, 344, 572 S.E.2d 108, 127 (2002). All in all, however, "the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' "[7] *Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129, 138 (2005) (quoting *Batson*, 476 U.S. at 93–94, 106 S. Ct. at 1721, 90 L. Ed. 2d at 86).

The Supreme Court has explicitly rejected the use of a "more likely than not" standard in determining whether a prima facie case of discrimination has been established on the grounds that such a test is "an inappropriate yardstick by which to measure the sufficiency of a prima facie case," *id.*, having reached this conclusion on the grounds that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " *Id.* at 169, 125 S. Ct. at 2416, 162 L. Ed. 2d at 138 (footnote omitted) (quoting *Batson*, 476 U.S. at 94, 106 S. Ct. at 1721, 90 L. Ed. 2d at 86). The "wide variety of evidence" that can be utilized to establish a prima facie case of discrimination could appropriately consist "solely o[f] evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial," *id.* (quoting *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723, 90 L. Ed. 2d at 87), with

---

[7] "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them.' " *Johnson v. California*, 545 U.S. 162, 168 n.4, 125 S. Ct. 2410, 2416 n.4, 162 L. Ed. 2d 129, 138 n.4 (quoting *Inference*, *Black's Law Dictionary* (7th ed. 1999)).

this stage of the required *Batson* analysis never having been intended "to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." *Id.* at 170, 125 S. Ct. at 2417, 162 L. Ed. 2d at 139. Instead, the Supreme Court intended that "a defendant [would] satisf[y] the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred," *id.*, with the existence of such a permissible inference not being the same thing as an ultimate conclusion that impermissible discrimination has, in fact, taken place. *Id.* at 171, 125 S. Ct. at 2417–18, 162 L. Ed. 2d at 140 (stating that "[t]he first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim" and that "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination" (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834, 839 (1995))). As a result, a court should not attempt to determine whether a prosecutor has actually engaged in impermissible purposeful discrimination at the first step of the *Batson* inquiry because "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging

in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Id.* at 172, 125 S. Ct. at 2418, 162 L. Ed. 2d at 140–41.

A careful review of the numerical disparity between the relative acceptance rates for African American and white prospective jurors, coupled with other inferences that can be derived from the record, such as the absence of any significant dissimilarity between the answers given by Mr. Smith, Ms. Brunson, and Ms. Corbett or any apparent indication arising from the face of the record that either Mr. Smith or Ms. Brunson would not have been satisfactory jurors from a prosecutorial point of view, satisfies us that defendant made out the necessary prima facie case of purposeful discrimination in this case. Prior to the point at which defendant asserted his *Batson* challenge, the prosecutor had questioned fourteen jurors, five of whom were African American and nine of whom were not. During that time, the prosecutor exercised two peremptory challenges in order to excuse African American prospective jurors and utilized no peremptory challenges to excuse white jurors. In other words, the prosecutor's strike rate was 40% for African American prospective jurors and 0% for white prospective jurors, while his acceptance rate for African American prospective jurors was 60% and his acceptance rate for white prospective jurors was 100%. In addition, 100% of the peremptory challenges that the prosecutor exercised were utilized to excuse African American prospective jurors, while none were utilized to excuse a white prospective juror. The disparity in these numbers, when coupled, as was noted by defendant's trial counsel during the proceedings before the trial

court, with the absence of any immediately obvious justification for the peremptory challenges directed to Mr. Smith and Ms. Brunson arising from the answers that they provided during the jury selection process, is sufficient to raise an inference that purposeful discrimination occurred. As a result, after considering all of the relevant factors disclosed in the record, we hold that the trial court's determination that defendant had failed to make out the required prima facie case was clearly erroneous and that the Court of Appeals erred by summarily affirming the trial court's determination with respect to this issue.[8]

In seeking to persuade us that the Court of Appeals did not err by upholding the trial court's rejection of defendant's *Batson* claim, the State asserts that "[t]his Court's jurisprudence is replete with cases upholding the trial court's finding of no

---

[8] As an aside, we note that the trial court's reference to the fact that the prosecutor had accepted three African American prospective jurors in finding that defendant had failed to make out a prima facie case of discrimination may rest upon a misapprehension of the manner in which *Batson* and its progeny should be applied, given that a single, racially motivated peremptory challenge directed to a qualified African American prospective juror may constitute grounds for a valid *Batson* claim regardless of the rate at which the prosecutor accepted African American prospective jurors over the course of the entire jury selection process. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241, 204 L. Ed. 2d 638, 653 (2019) (stating that, "[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many"). As the Supreme Court has stated, the acceptance of a small number of African American jurors could be intended "to obscure the otherwise consistent pattern of opposition to" seating other African American jurors. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 250, 125 S. Ct. 2317, 2330, 162 L. Ed. 2d 196, 220 (2005). Similarly, the fact that defendant's trial counsel had peremptorily challenged three white jurors does not, standing alone, provide a non-discriminatory explanation for the prosecutor's decision to peremptorily challenge two African American prospective jurors at defendant's trial. *Flowers*, 139 S. Ct. at 2242, 204 L. Ed. 2d at 654 (stating that "[d]iscrimination against one defendant or juror on account of race is not remedied or cured by discrimination against other defendants or jurors on account of race").

*prima facie* showing under *Batson* [with] acceptance rates of African[ ]American prospective jurors closely analogous to or lower than that alleged in this case." To be sure, "one factor tending to refute a showing of discrimination is the State's acceptance of black jurors." *State v. Thomas*, 329 N.C. 423, 431, 407 S.E.2d 141, 147 (1991) (citing *State v. Smith*, 328 N.C. 99, 121, 400 S.E.2d 712, 724 (1991)). Although such information "is relevant to our inquiry, . . . it is not dispositive." *Smith*, 328 N.C. at 121, 400 S.E.2d at 724. Moreover, in recent years, the Supreme Court has treated prosecutorial claims that the acceptance of other African American prospective jurors constituted a defense to a *Batson* claim with considerable skepticism. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2246, 204 L. Ed. 2d 638, 659 (2019) (quoting *Miller-El II*, 545 U.S. at 250, 125 S. Ct. at 2330, 162 L. Ed. 2d at 220) (stating that, "[i]n *Miller-El II*, this Court skeptically viewed the State's decision to accept one black juror, explaining that a prosecutor might do so in an attempt 'to obscure the otherwise consistent pattern of opposition to' seating black jurors"). Finally, the State's attempt to derive a bright-line test from our prior decisions for the purpose of identifying those cases in which a defendant has or has not established a prima facie case of discrimination based solely upon the rate at which the prosecutor accepted other African American prospective jurors conflicts with the highly fact-specific nature of the inquiry required under *Batson* and its progeny, which requires consideration of all relevant factors. As a result, we do not find the State's argument that defendant failed to show the existence of the required prima facie case of discrimination based

upon the fact that the prosecutor accepted three of the five African American prospective jurors that were tendered to him for questioning to be persuasive.

A careful analysis of the cases cited in support of the State's "acceptance rate" argument also establishes that these decisions are not, in almost all instances, susceptible to the interpretation that the State has sought to place upon them. In *Taylor*, this Court upheld the trial court's decision to refrain from finding a prima facie case of purposeful discrimination in a case in which the prosecutor peremptorily challenged seven white jurors and the peremptory challenge to which the defendant's *Batson* challenge was addressed involved a juror who had "expressed tremendous hesitation in being able to vote for the death penalty." 362 N.C. at 528–30, 669 S.E.2d at 254–55; *see also State v. Nicholson*, 355 N.C. 1, 23–24, 558 S.E.2d 109, 126 (2002) (upholding the trial court's determination that the defendant had failed to establish a prima facie case of purposeful discrimination when the peremptory challenges to which the defendant's *Batson* claim was directed had been exercised early in the jury selection process to excuse prospective jurors who had expressed serious reservations about the imposition of the death penalty); *see also State v. Fletcher*, 348 N.C. 292, 319, 500 S.E.2d 668, 683–84 (1998) (upholding the trial court's decision to refrain from finding the existence of a prima facie case of purposeful discrimination based upon the prosecutor's exercise of a peremptory challenge directed to a prospective juror who "indicated ambivalence towards the death penalty" given that the record reflected that the trial court "did not ignore all factors other than the number of

blacks on the jury"). In *State v. Gregory*, this Court upheld the trial court's determination that the defendant had failed to establish a prima facie case of purposeful discrimination given that the prosecutor had exercised five peremptory challenges against white jurors and that the record "establish[ed] substantial reasons other than purposeful discrimination for each peremptory challenge at issue." 340 N.C. 365, 398–99, 459 S.E.2d 638, 657 (1995). In *State v. Ross*, this Court upheld the trial court's determination that the defendant had failed to establish a prima facie case of purposeful discrimination on the grounds that "[t]he only peremptory challenge exercised by the prosecutor excused a black man from the jury" and that there was no other evidence raising an inference of discrimination. 338 N.C. 280, 286, 449 S.E.2d 556, 561 (1994). Finally, in *State v. Beach*, this Court upheld the trial court's determination that the defendant failed to establish a prima facie case of purposeful discrimination on the basis of a record showing that, even though "[t]he State exercised peremptory challenges to ten [African American prospective jurors] or sixty-three percent of them," it had also peremptorily challenged multiple white prospective jurors as well. 333 N.C. 733, 740, 430 S.E.2d 248, 252 (1993). Although this Court did uphold the trial court's determination in *State v. Abbott* that the defendant had failed to establish a prima facie case of purposeful discrimination because "[t]he State was willing to accept 40% [two out of five] of the blacks tendered" without any additional analysis of the record, 320 N.C. 475, 481, 358 S.E.2d 365, 369 (1987), the Court's description of the applicable inquiry as being whether the State

"was determined not to let a black sit as a juror on account of the race of the defendant," *id.* at 482, 358 S.E.2d at 370, suggests that *Abbott* rests upon a misunderstanding of the applicable law as clarified in numerous subsequent decisions such as *Quick* and *Flowers*. As a result, none of the decisions upon which the State appropriately relies, when analyzed closely, indicate that acceptance rates, standing alone, suffice to preclude a finding that the defendant has made out a prima facie case of purposeful discrimination, particularly in the face of evidence that all of the State's peremptory challenges were directed to African American prospective jurors, that the State did not peremptorily challenge any white prospective juror, and that neither of the African American jurors that the State peremptorily challenged provided any answers during the course of the jury selection process that cast any doubt upon their ability to be fair and impartial to the State.[9]

The appropriate remedy for a trial court's erroneous failure to find the existence of a prima facie case at the first step of the required *Batson* analysis is a remand to the trial court for a hearing to be held for the purpose of completing the second and third steps of the required analysis. *See, e.g.*, *Barden*, 356 N.C. at 345,

---

[9] Any reliance upon this Court's decision in *State v. Belton*, 318 N.C. 141, 347 S.E.2d 755 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997), would be misplaced given our determination in *State v. Jackson*, 317 N.C. 1, 21, 343 S.E.2d 814, 826 (1986), that *Batson* was not entitled to retroactive application. The Supreme Court subsequently vacated *Jackson* in light of its decision in *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987), holding that *Batson* applied retroactively on direct review. *Jackson v. North Carolina*, 479 U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 133 (1987).

572 S.E.2d at 128. At the required remand proceeding, the trial court shall afford the State an opportunity to proffer race-neutral reasons for the peremptory challenges that the prosecutor directed to Mr. Smith and Ms. Brunson. In the event that the trial court determines that the prosecutor has failed to offer race-neutral reasons for the peremptory challenges in question, it shall order that defendant receive a new trial. If the prosecutor offers race-neutral reasons for having peremptorily challenged Mr. Smith and Ms. Brunson, defendant shall be given an opportunity to establish that the reasons advanced by the prosecutor are pretextual. In the event that defendant satisfies the trial court on remand that the peremptory challenges directed to Mr. Smith or Ms. Brunson were substantially motivated by race, the trial court shall order that defendant receive a new trial. On the other hand, if the trial court determines on remand that defendant has failed to make the necessary showing of purposeful discrimination, the trial court shall make appropriate findings of fact and conclusions of law to be certified to this Court for any further proceedings that this Court determines to be appropriate. As a result, the Court of Appeals' decision in this case is reversed and this case is remanded to the Court of Appeals for further remand to the Superior Court, Sampson County, for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice NEWBY dissenting.

Our case law has emphasized that an adequate record on appeal is established by having jurors themselves identify their races. This Court has repeatedly rejected attempts to create a record of race based solely on observations of outward appearance. Nevertheless, the majority misreads our prior cases and takes a case that is a procedural anomaly out of context to conclude that subjective impressions of individuals are sufficient to identify race by appearance so long as the impressions are "stipulated" to by the parties.

Further, under the first step of a *Batson* challenge, the trial court considers the defendant's arguments and its own observations of various factors to determine if the defendant has made "a prima facie showing of intentional discrimination under the 'totality of the relevant facts' in the case." *State v. Waring*, 364 N.C. 443, 474, 701 S.E.2d 615, 636 (2010) (quoting *Batson v. Kentucky*, 476 U.S. 79, 94, 106 S. Ct. 1712, 1721 (1986)). Under our precedent, we review the trial court's decision under a deferential abuse of discretion standard. While correctly stating that standard, the majority usurps the role of the trial court by finding facts, reweighing various factors, and substituting its judgment for that of the trier of fact. It further creates arguments for defendant not presented to the trial court or the Court of Appeals, and then faults those courts for not considering them. In reversing the trial court, the majority ignores the totality of relevant circumstances and primarily focuses on one factor, the percentage of minority juror peremptory challenges exercised by the State.

Essentially, the majority now holds that the prosecutor's use of a single peremptory challenge against a minority satisfies a defendant's burden of showing intentional discrimination under *Batson*'s first prong, triggering a full *Batson* review. Because the *Batson* challenge was not properly preserved for appellate review and the trial court did not abuse its discretion in concluding that defendant failed to establish a prima facie showing under *Batson*'s first prong, I respectfully dissent.

Here defendant did not have the prospective jurors identify their races for the record. Defendant later challenged the State's sequential peremptory challenges of two prospective jurors, both of whom were assigned to seat number ten. The State used its first peremptory challenge to remove Roger Smith; defendant did not make a *Batson* challenge. Smith's replacement was Virginia Brunson. The State used its second peremptory challenge to remove her; defendant did not make a *Batson* challenge. Seat number ten was then filled by Rita Corbett. Only after the State passed Corbett did defendant raise a *Batson* challenge.

Later and outside the presence of the prospective jurors, defense counsel set forth her *Batson* argument:

> [Defense Counsel]: Judge, I do have a *Batson* motion. And Judge, the basis of my motion goes to the fact that in Seat Number[ ] 10, we had two jurors, [Roger] Smith and Virginia Brunson, both of whom were black jurors, and both of whom were excused. And, Judge, in the State's voir dire of both jurors, there was no overwhelming evidence, there was nothing about any prior criminal convictions, any feelings about—towards or against law enforcement,

there's no basis, other than the fact that those two jurors happened to be of African-American de[s]cent they were excused.

We heard from Mr. Smith who stated that he was a supervisor here in Clinton and had a breaking and entering two and a half years ago. Nobody was charged, but he had no feelings towards law enforcement, no negative experience with the DA's office. And, with Ms. Virginia Brunson, we heard that she owned a beauty salon that was next to ABC Insurance. She didn't know anyone in the audience or anyone in the case. There was nothing that was deduced during the jury voir dire that would suggest otherwise.

The State then countered that defense counsel's only argument, that both of the prospective jurors excused were black, was insufficient to establish a prima facie showing of discriminatory intent. The trial court ruled:

Madam Clerk, the Court, from the evidence, the arguments of counsel on the record, the Court finds there is no evidence of a showing of prejudice based on race or any of the contentions in *Batson*, [N.C.G.S. §] 912A, [N.C.G.S. §] 15A-958. The Court further finds that out of the five jurors who were African-American, three still remain on the panel and have been passed by the State. The Court concludes there is no prima facie showing justifying the *Batson* challenge; therefore, the defendant's motion is denied.

The ability to serve on a jury is one of "the most substantial opportunit[ies] that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019) (citing *Powers v. Ohio*, 499 U.S. 400, 407, 111 S. Ct. 1364, 1369 (1991)). The right to jury service is protected by the Equal

Protection Clause of the federal constitution and Article I, Section 26 of the North Carolina Constitution.

In jury trials, however, attorneys are given the right to excuse a certain number of prospective jurors through discretionary strikes. "Peremptory strikes have very old credentials and can be traced back to the common law." *Id.* at 2238. "[P]eremptory strikes traditionally may be used to remove any potential juror for any reason—no questions asked." *Id.*; *see also* N.C.G.S. § 15A-1217 (2019) (codifying the availability of peremptory challenges in criminal cases by setting the number of peremptory challenges allowed based on the type of criminal proceeding).

The Equal Protection Clause, which prohibits discrimination, can clash with an attorney's ability to freely exercise peremptory challenges. *Id.* at 2238. Because of this tension, the Supreme Court of the United States recognized limitations on peremptory challenges to ensure that strikes are not used for a discriminatory purpose against a protected class. Thus, in *Batson* the Supreme Court set forth a three-prong test for trial courts to determine whether the State improperly discriminated by dismissing a prospective juror based on his race.

This Court expressly "adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution." *State v. Fair*, 354 N.C. 131, 140, 557 S.E.2d 500, 509 (2001) (citing *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 121 S. Ct. 789 (2001); *State v. Mitchell*, 321

N.C. 650, 365 S.E.2d 554 (1988)). *Batson* sets forth a three-step analysis, placing the burden on each party at different points to protect both the State and the defendant:

> First, the party raising the claim must make a prima facie showing of intentional discrimination under the "totality of the relevant facts" in the case. Second, if a prima facie case is established, the burden shifts to the State to present a race-neutral explanation for the challenge. Finally, the trial court must then determine whether the defendant has met the burden of proving "purposeful discrimination."

*Waring*, 364 N.C. at 474–75, 701 S.E.2d at 636 (first quoting *Batson*, 476 U.S. at 94, 106 S. Ct. at 1721; then citing *Rice v. Collins*, 546 U.S. 333, 333, 126 S. Ct. 969, 970–71 (2010); and then quoting *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324 (2005)).

The first prong of the *Batson* test is relevant here. In order for an appellate court to review a *Batson* challenge, however, there must be a sufficient record establishing the jurors' races. Our precedent clearly holds that a subjective impression of a prospective juror's race by one or more court officials is insufficient to establish a record adequate for appellate review. When appealing a trial court's determination of a *Batson* challenge, a defendant has the burden to ensure that the prospective jurors' races are a part of the record. *Mitchell*, 321 N.C. at 656, 365 S.E.2d at 557. Only from an adequate record can an appellate court "determine whether jurors were improperly excused by peremptory challenges at trial." *Id.* at 654, 365 S.E.2d at 556.

Here the only information about the race of some of the prospective jurors arose from observations by defense counsel and then by the trial court. The facts presented here are very similar to those in *State v. Brogden*, 329 N.C. 534, 407 S.E.2d 158 (1991), where this Court held that the record was insufficient for appellate review. In *Brogden*, based upon our prior holdings in *Mitchell* and *State v. Payne*, 327 N.C. 194, 200, 394 S.E.2d 158, 161 (1990), *cert. denied*, 498 U.S. 1092, 111 S. Ct. 977 (1991), this Court specified the appropriate ways to preserve a prospective juror's race for the record. There the defendant requested, and the trial court allowed, defense counsel and the court reporter to record the race and sex of each prospective juror that the State peremptorily challenged. *Brogden*, 329 N.C. at 546, 407 S.E.2d at 166. The record is unclear if the trial court or the State were consulted about the race identifications made by defense counsel and the court reporter. Relying on both *Mitchell* and *Payne*, this Court stated that the record only contained the subjective impressions of defense counsel and the court reporter about the jurors' races, which were insufficient to establish the record for appellate review of the merits. *Id.* Because the defendant had "fail[ed] to elicit from the jurors by means of questioning or other proper evidence the race of each juror," this Court concluded that the defendant "failed to carry his burden of establishing an adequate record for appellate review." *Id.*

Similarly, in *Payne* this Court emphasized the need for a defendant to establish prospective jurors' races for the record.[1] *Payne*, 327 N.C. at 198–200, 394 S.E.2d at 159–61. There, after jury selection had occurred, the defendant moved the trial court to require the clerk to record the race and sex of various jurors. *Id.* at 198, 394 S.E.2d at 159. The trial court denied the defendant's motion. *Id.* The next day, the defendant renewed his motion and, in support, submitted an affidavit from one of defendant's attorneys purporting to contain the name of each black prospective juror examined. *Id.* at 198, 394 S.E.2d at 159–60. In its ruling, the trial court made findings of fact, relying on the affidavit, but ultimately rejected the merits of the defendant's *Batson* challenge. *Id.* at 198, 394 S.E.2d at 160.

On appeal, neither party argued the record was inadequate. While before the trial court the State refrained from commenting on the racial identities of prospective jurors, the State acquiesced to what occurred in the trial court and did not raise the question of an inadequate record to this Court. On its own, this Court, however, held that appellate review of the *Batson* challenge was unavailable because defendant failed to preserve an adequate record. We stated that having a prospective juror specify his or her race for the record would have provided an accurate record needed for appellate review. *Id.* at 199–200, 394 S.E.2d at 160–61. The Court concluded that the defense counsel's affidavit containing his subjective impressions of each

---

[1] One of the defendant's attorneys of record in *Payne* is the author of the majority opinion here.

prospective juror's race, and the trial court's findings based on the affidavit were insufficient to preserve the record on appeal. The Court held that defense counsel's perceptions are "no more adequate than the court reporter's or the clerk's would have been, as we recognized in *Mitchell*." *Id.* at 200, 394 S.E.2d at 161. Despite there having been a stipulation, in that no one argued the record was inadequate and that the trial court made findings about various jurors' races, we found the appellate record was inadequate. We did not suggest that a stipulation between the trial court and counsel would have overcome this deficiency.

In *Mitchell* this Court also rejected the idea that a subjective interpretation of a prospective juror's race would be sufficient to establish the record for appellate review. In *Mitchell* the defendant unsuccessfully moved to have the court reporter note the race of every prospective juror in order to establish the record for appeal. *Mitchell*, 321 N.C. at 655, 365 S.E.2d at 557. In considering preservation before reviewing the defendant's arguments on appeal, this Court noted that

> [a]lthough this approach *might* have preserved a proper record from which an appellate court could determine if any potential jurors were challenged solely on the basis of race, *we find it inappropriate*. To have a court reporter note the race of every potential juror examined would require a reporter alone to make that determination without the benefit of questioning by counsel or any other evidence that might tend to establish the prospective juror's race. The court reporter, however, is in no better position to determine the race of each prospective juror *than the defendant, the court, or counsel*. An individual's race is not always easily discernable, and the potential for error by a court reporter acting alone is great.

*Id.* at 655–56, 365 S.E.2d at 557 (second and third emphasis added). The Court further observed that defendant's proposed approach "would denigrate the task of preventing peremptory challenges of jurors on the basis of race to the reporter's 'subjective impressions as to what race they spring from.' " *Id.* at 656, 365 S.E.2d at 557 (quoting *Batson*, 476 U.S. at 130 n.10, 106 S. Ct. at 1740 n.10 (Burger, C.J., dissenting)).

Defendant here, unlike the defendants in *Mitchell*, *Payne*, and *Brogden*, made *no* effort to preserve the race of the jurors for the record. Defendant neither requested that anyone record the races of the challenged prospective jurors nor asked the jurors to identify their races. Moreover, defendant failed to include juror questionnaires in the record which would include each juror's racial self-identification. Defense counsel did not provide a sworn affidavit as the defense counsel did in *Payne*. Here defense counsel simply made an argument. Though defense counsel identified the two challenged prospective jurors as black and the trial court indicated that the State had passed three black prospective jurors to the defense, there is no record of the race of any other juror which is needed to give context and allow for a proper review of the State's actions. Based on our precedent set forth in *Mitchell*, *Payne*, and *Brodgen*, defendant did not meet the burden to establish the race of the jurors, resulting in this Court not having a sufficient record to permit appellate review. Thus, this Court should not reach the merits of defendant's *Batson* claim.

The majority tries to distinguish *Mitchell*, *Payne*, and *Brogden* from this case by stating that in those cases "the defendant attempted to establish the racial identities of each of the prospective jurors on the basis of the subjective impressions of a limited number of trial participants." In other words, the majority believes the holding of these cases turns on the number of individuals who acquiesce in determining race based on outward appearances. This analysis fails, given that in *Brogden*, the prospective jurors' races were established by the subjective impressions of both defense counsel and the court reporter. Likewise, in *Payne* the prospective jurors' races were established by defense counsel's sworn affidavit with which the trial court agreed as it utilized the information contained in the affidavit to issue findings of fact about the race of the challenged jurors in order to conduct its *Batson* analysis. In doing so, the first step would have been for the court to make findings of the races of the jurors that were challenged. As noted in both cases, this Court held that the jurors' races were not properly established or preserved. Whether singly or collectively, our cases hold that it is improper for individuals to determine race based on appearance. The approved method of preservation is for each of the jurors to self-identify their races. Simply put, any other method, whether through stipulation or consensus, is based on the subjective view of an individual's outward appearance as opposed to a person's true racial identity, making these other methods improper under the rationale of this Court's precedent. The majority's holding that a record of

juror's races is preserved simply because more than one person agrees on the races overturns our case law.

The majority seeks to bolster its holding that the identification of race based upon outward appearance should be accepted by characterizing the parties' arguments and the trial court's ruling as a "stipulation." This Court, however, rejected a similar approach in *Payne*. There, in order for the trial court to rule that defendant had failed to make a prima facie showing of discrimination, it first had to make findings of the races of various jurors. *See Payne*, 327 N.C. at 198, 394 S.E.2d at 159–60. Further, no one argued on appeal that the record was inadequate. Nothing in our controlling case law indicates that a stipulation based on outward appearance is adequate.

The majority relies on this Court's decision in *State v. Jackson*, 322 N.C. 251, 368 S.E.2d 838 (1988), to advance its theory that a "stipulation" may establish racial identities of prospective jurors. The majority boldly declares that "our prior decisions clearly allow for the use of methods other than self-identification for the purpose of determining the racial identity of prospective jurors." In doing so, however, the majority takes a single case out of context and ignores the fact that it is an anomaly based on its unique and nuanced procedural history. This Court decided the defendant's direct appeal in *Jackson* in 1986. *State v. Jackson,* 317 N.C. 1, 343 S.E.2d 814 (1986). The defendant in that case then filed a petition for writ of certiorari with the Supreme Court of the United States.

After the defendant's trial and approximately one month before this Court issued its decision in the case, in April of 1986 the Supreme Court of the United States decided *Batson v. Kentucky*, which established a new framework for defendants to challenge the exclusion of minority jurors on equal protection grounds. *See Batson*, 476 U.S. at 100, 106 S. Ct. at 1725. Notably, *Batson* overruled the Court's prior decision in *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824 (1965), which had created a much more difficult standard for a defendant to establish any sort of discrimination in jury selection sufficient to warrant relief. Following *Batson*, the Supreme Court of the United States in *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708 (1987), decided that the *Batson* framework would apply to litigation that was pending on direct review when *Batson* was decided. *Id.* at 316, 107 S. Ct. at 709. Since the defendant had petitioned the Supreme Court of the United States for a writ of certiorari and thus the case was pending at the time *Batson* was decided, the Supreme Court of the United States remanded *Jackson* to the North Carolina Supreme Court to consider the case in light of the newly established *Batson* principles. *Jackson v. North Carolina*, 479 U.S. 1077, 107 S. Ct. 1271 (1987).

Because *Batson* had not been decided at the time that the defendant in *Jackson* was tried, the parties did not preserve a record of the race of any of the jurors, including the excused jurors, nor did they record a transcript of the proceeding. Nonetheless, based on the express order from the Supreme Court of the United States and the further remand from our Supreme Court, the trial was required to consider

the defendant's argument in light of the recently established *Batson* rules. Because of this unique procedural history, the trial could only use the limited information that was available to comply with the United States Supreme Court's directive and reach the merits of the *Batson* challenge.[2] *Jackson*, 322 N.C. at 252, 368 S.E.2d at 839. Ultimately, the trial court was forced the rely on a stipulation between the State and the defendant about what happened at trial, an affidavit from one of the prosecutors who tried the case, and the trial notes of the attorneys. *Id.* Pursuant to the instructions from the Supreme Court of the United States, this Court then reviewed the trial court's decision.

The majority, however, ignores this procedural anomaly and instead utilizes a strained reading of the case to support its desired outcome. *Jackson* does not reflect a typical *Batson* case, i.e., one that arises after the Supreme Court of the United States established the *Batson* framework. Because there are more recent cases from this Court which reject the exact rationale that the majority advances here, that subjective impressions are sufficient to establish a juror's race for the record, the majority's rationale simply cannot withstand scrutiny without overruling our more recent cases.

---

[2] No one in *Jackson* objected to the procedure. Notably, it appears to be the only procedure that would have been open to the parties given that the Supreme Court of the United States would have just released *Batson* around that time, meaning that the courts would have had to develop a new system for handling cases falling within its purview. It would have been improper for this Court to have then disallowed *Batson* review based on how the record was recreated under these unusual circumstances.

Moreover, the majority here wrongly interprets the language of our cases which recognizes that there are methods other than questioning by counsel through which a juror may establish his race. As previously mentioned and consistent with this Court's rationale in prior cases, another method of establishing race other than questioning by counsel is the use of juror questionnaires. This Court, however, upends that rationale by now holding that subjective views of outward appearance are adequate to establish a juror's race so long as they are part of the trial court's findings. In our cases, this Court has had numerous opportunities to endorse the approach adopted today but did not do so.

Even if the issue had been properly preserved, the trial court did not clearly err in rejecting defense counsel's sparse argument that the State discriminated in exercising two peremptory challenges. The standard of review for *Batson* challenges is well-established. Because the trial court's determination on the first step of *Batson* involves its assessment of the prosecutor's credibility and other factors, the trial court's decision is reviewed for abuse of discretion. *See Jackson*, 322 N.C. at 255, 368 S.E.2d at 840 ("Since the trial court's findings will depend on credibility, a reviewing court should give those findings great deference." (citing *Batson*, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21)). As the majority recognizes, a trial court's ruling on a *Batson* challenge, including its determination of whether a defendant has made a prima facie showing of discrimination, "will be sustained 'unless it is clearly erroneous.' " *Waring*, 364 N.C. at 475, 701 S.E.2d at 636 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477,

128 S. Ct. 1203, 1207 (2008)); *see State v. Taylor*, 362 N.C. 514, 528, 669 S.E.2d 239, 254 (2008) (stating that a trial court's findings on whether a defendant has made a prima facie showing of discrimination will be upheld "unless they are clearly erroneous"). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816 (quoting *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991)). Moreover, the clearly erroneous standard of review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985). "Trial judges, who are 'experienced in supervising voir dire,' and who observe the prosecutor's questions, statements, and demeanor firsthand, are well qualified to 'decide if the circumstances concerning the prosecutor's use of peremptory challenges create[ ] a prima facie case of discrimination against black jurors.' " *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (quoting *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723).

Consistent with other equal protection challenges, *Batson* places the burden on the defendant, the opponent of the peremptory challenge, to make a prima facie showing that the State discriminated in exercising its peremptory challenge. A "government[ ] action claimed to be racially discriminatory 'must ultimately be traced

to a racially discriminatory purpose.' " *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721 (quoting *Washington v. Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040, 2048 (1976)).

Importantly, in this first step the defendant has the burden to show that the prosecutor has acted with "intentional discrimination under the 'totality of the relevant facts' in the case." *Waring*, 364 N.C. at 747–75, 71 S.E.2d at 626 (quoting *Batson*, 476 U.S. at 94, 106 S. Ct. at 1721). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial [court] to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 2417 (2005). Nevertheless, the first step is important in minimizing disruption to the jury selection process, limiting the number of trials within trials that occur with full *Batson* hearings. *See Jackson*, 322 N.C. at 258, 368 S.E.2d at 842 ("We do not believe we should have a trial within a trial. The presiding judges are capable of passing on the credibility of prosecuting attorneys . . . ."). Several factors are relevant in determining whether a defendant has carried the burden to show an inference that the State discriminated in exercising peremptory challenges.

> Those factors include the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single

case, and the State's acceptance rate of potential black
jurors.

*State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995).

The majority cites but fails to apply the *Quick* factors here, which address the totality of relevant circumstances analysis *Batson* requires. When applying these factors, however, it is clear that the trial court did not abuse its discretion. Defendant was charged with committing drug offenses, crimes in which there were no discernible victims. There is no record of the races of the witnesses in this case. In the trial court's view and as supported by the record, the State did not engage in any disproportionate questioning or make any racially charged statements which would support an inference of discrimination. The State only exercised two peremptory challenges for seat number ten, both against black prospective jurors, but it passed at least three black prospective jurors to the defense, amounting to at least a 60% acceptance rate. Having exercised only two of the six available peremptory challenges, it cannot be said that there was any sort of "pattern of strikes" that the State exercised against any discernible group here. Thus, considering all of the circumstances required by our case law, there is more than adequate support for the trial court's ruling, which was explicitly based on the evidence presented and the arguments of counsel, and further supported by the State's minority acceptance rate.

At trial defense counsel's only argument to establish a prima facie showing of intentional discrimination was that two peremptory challenges had been exercised

against black prospective jurors and that there was no obvious reason for their use. The majority accepts this argument, holding that the trial court's rejection of that argument amounted to an abuse of discretion. The majority states that "[a] careful review of the numerical disparity between the relative acceptance rates for African American and white prospective jurors, coupled with other inferences that can be derived from the record . . . satisfies us that defendant made out the necessary prima facie case of purposeful discrimination in this case." While mentioning "other inferences that can be derived from the record," it focuses on what it characterizes as no "immediately obvious justification" for the State's use of the peremptory challenges. In searching to support its position with "other inferences," the majority impermissibly creates an argument not presented to the trial court or Court of Appeals: that there was an "absence of any significant dissimilarity between the answers given by Mr. Smith, Ms. Brunson, and Ms. Corbett." Thus, it strays from the role of appellate court by creating an argument for defendant and finding from a cold record facts to support it. The majority ignores the *Quick* factors and holds that the first step of *Batson* is met when the State exercises a peremptory challenge against a minority prospective juror without an "immediately obvious justification." Though the evidentiary bar for a defendant to establish a prima facie showing of discrimination is not high, this new first step clearly is inadequate under our existing case law.

Significantly, the only argument actually presented to the trial court was that the prosecutor had used its two peremptory challenges on black prospective jurors without "overwhelming evidence" as to why. The trial court, having observed the entire process and considered the evidence, defense counsel's presentation and the arguments of counsel on the record, found "there is no evidence of a showing of prejudice based on race or any of the contentions in *Batson*." It then itself noted, consistent with our prior case law, that another pertinent consideration was that the State had accepted 60% of the black prospective jurors. The trial court did not focus only on this statistic, as implied by the majority, but considered it with the other required factors.

As relied on by the trial court, this Court has consistently held that statistics are a pertinent factor in determining whether a defendant has met his burden to make a prima facie showing of intentional discrimination. *See State v. Barden*, 356 N.C. 316, 344, 572 S.E.2d 108, 127–28 (2002). In *Taylor*, 362 N.C. at 529, 669 S.E.2d at 255, this Court observed that the trial court properly concluded that the defendant failed to make a prima facie showing of intentional discrimination. At the time of the defendant's *Batson* challenge in that case, the State had accepted two out of five, or 40%, of the black prospective jurors. *Id.* "This Court has previously cited similar acceptance rates as tending to refute an allegation of discrimination." *Id.* (*citing State v. Fletcher*, 348 N.C. 292, 320, 500 S.E.2d 668, 684 (1998) (concluding that the defendant had not established a prima facie case of intentional discrimination when

the State's acceptance rate of black prospective jurors was 40%); *State v. Abbott*, 320 N.C. 475, 480–82, 358 S.E.2d 365, 369–70 (1987) (same)).

In *State v. Beach*, 333 N.C. 733, 430 S.E.2d 248 (1993), this Court rejected the defendant's argument that the Court should not consider the number of black prospective jurors that the State accepted. The Court stated that "[i]n a case in which one of the methods the defendant uses in an attempt to show discrimination is the pattern of strikes, we cannot ignore the number of black jurors accepted by the State." *Id*. at 740, 430 S.E.2d at 252. Though the State exercised more peremptory challenges to excuse black prospective jurors than to excuse white prospective jurors, the Court concluded that even a 37% acceptance rate of black prospective jurors was insufficient alone to establish a prima facie case of discrimination. *Id*. Because the transcript revealed that the State had conducted "an evenhanded examination" of both white and black prospective jurors, the Court held that the trial court did not err in concluding that the defendant failed to establish a prima facie showing of intentional discrimination. *Id*.

In fact, this Court has "held that a defendant failed to establish a *prima facie* case of discrimination where the minority acceptance rate was 66%, 50%, 40%, and 37.5%." *Barden*, 356 N.C. at 344, 572 S.E.2d at 128 (first citing *State v. Ross,* 338 N.C. 280, 285–86, 449 S.E.2d 556, 561–62 (1994); then citing *State v. Nicholson,* 355 N.C. 1, 24, 558 S.E.2d 109, 127, *cert. denied,* 537 U.S. 845, 123 S. Ct. 178 (2002); then citing *State v. Belton,* 318 N.C. 141, 159–60, 347 S.E.2d 755, 766 (1986), *overruled on*

*other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396 (1997); then citing

*Fletcher,* 348 N.C. at 320, 500 S.E.2d at 684; then citing *Abbott,* 320 N.C. at 481–82,

358 S.E.2d at 369–70; and then citing *State v. Gregory,* 340 N.C. 365, 398, 459 S.E.2d

638, 657 (1995), *cert. denied,* 517 U.S. 1108, 116 S. Ct. 1327 (1996)).

For the first time, however, the majority of this Court holds that a 60%

acceptance rate of prospective black jurors paired with no "immediately obvious

justification" for the State's exercise of its peremptory challenges is sufficient to show

that the trial court clearly erred in determining that defendant had not established a

prima facie case of discrimination. In doing so, the majority *sub silentio* overrules this

Court's *Batson* precedent which had held that much higher rejection rates of black

prospective jurors standing alone were insufficient to establish a prima facie showing

of intentional discrimination.

The majority essentially removes the defendant's burden and eliminates the

first step of *Batson.* No longer must a defendant show intentional discrimination.

Instead, the majority rewrites decades of *Batson* precedent to establish a framework

in which the first step is met when the State excuses a minority prospective juror.

In the past this Court has recognized that jury selection "is 'more art than

science' and that . . . a prosecutor may rely on legitimate hunches in the exercise of

peremptory challenges." *State v. Barnes*, 345 N.C. 184, 212, 481 S.E.2d 44, 59  (1997)

(first quoting *State v. Porter,* 326 N.C. 489, 501, 391 S.E.2d 144, 152 (1990); and then

citing *State v. Rouse*, 339 N.C. 59, 79, 451 S.E.2d 543, 554 (1994), *overruled on other grounds by State v. Hurst,* 360 N.C. 181, 624 S.E.2d 309 (2006)). The majority's conclusion here eliminates any ability for the State to exercise legitimate hunches or other nonverbal cues not evident in a cold record on appeal. The majority's analysis overrules this Court's stated standard of review of abuse of discretion. It gives no deference to the trial court, ignoring the extremely deferential and well-established standard of review. In effect, the majority usurps the role that clearly belongs to the trial court by reweighing the evidence gleaned from a cold record.

In finding that defendant did not present a prima facie case of discrimination, the trial court properly considered the evidence and arguments of counsel as well as the 60% minority passage rate. Its decision is supported by the record and is not clearly erroneous. Because defendant failed to preserve the record for appellate review, and because, regardless, the trial court did not abuse its discretion in concluding that defendant failed to carry his burden of establishing a prima facie showing of intentional discrimination required to satisfy the first step of the *Batson* analysis, I respectfully dissent.